

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Alejandro Confesor Rodríguez Ramos; Hilda Rodríguez Olavarría; Marisol, Alejandro Confesor y María del Carmen Rodríguez Rodríguez<br><br>Peticionarios<br><br>v.<br><br>Hospital Dr. Susoni Inc., Administración de Servicios Médicos de P.R. (A.S.E.M.); Hospital Dr. Alejandro Otero López, Inc., Dr. Emilio Ramos Escoda (Apelante) y la Sociedad Legal de Bienes Gananciales compuesta entre éste y su esposa desconocida; Dr. Oscar Hernández y la Sociedad Legal de Bienes Gananciales compuesta por éste y su esposa desconocida; Dr. Samuel A. Amill y la Sociedad Legal de Bienes Gananciales compuesta entre éste y su esposa desconocida; Dra. Sheila González y la Sociedad Legal de Bienes Gananciales compuesta entre ésta y su esposo desconocido; Dr. Luis Rodríguez Rodríguez y la Sociedad Legal de Bienes Gananciales compuesta entre éste y su esposa desconocida; Dr. Fulano Figueroa y la Sociedad Legal de Bienes Gananciales compuesta entre éste y su esposa desconocida; Seguros Triple S, Inc.; S.I.M.E.D.; Continental Casualty, Co.<br><br>Recurridos | Certiorari<br><br>2012 TSPR 150<br><br>186 DPR ____ |

Número del Caso: CC-2011-315
                 CC-2011-327

Fecha: 9 de octubre de 2012

Tribunal de Apelaciones:

Región Judicial de Arecibo - Humacao

## CC-2011-315

Abogada de la Parte Peticionaria:

Lcda. Karin M. Valle Fabricio

Abogado del Recurrido:

Lcdo. Pedro Toledo González

## CC-2011-327

Abogado de la Parte Peticionaria:

Lcdo. Pedro Toledo González

Abogada de la Parte Recurrida:

Lcda. Karin M. Valle Fabricio

Materia: Daños y Perjuicios – (Impericia Médica)

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Alejandro Confesor Rodríguez Ramos; Hilda Rodríguez Olavarría; Marisol, Alejandro Confesor y María del Carmen Rodríguez Rodríguez<br><br>    Peticionarios<br><br>    v.<br><br>Hospital Dr. Susoni Inc., Administración de Servicios Médicos de P.R. (A.S.E.M.); Hospital Dr. Alejandro Otero López, Inc., Dr. Emilio Ramos Escoda (Apelante) y la Sociedad Legal de Bienes Gananciales compuesta entre éste y su esposa desconocida; Dr. Oscar Hernández y la Sociedad Legal de Bienes Gananciales compuesta por éste y su esposa desconocida; Dr. Samuel A. Amill y la Sociedad Legal de Bienes Gananciales compuesta entre éste y su esposa desconocida; Dra. Sheila González y la Sociedad Legal de Bienes Gananciales compuesta entre ésta y su esposo desconocido; Dr. Luis Rodríguez Rodríguez y la Sociedad Legal de Bienes Gananciales compuesta entre éste y su esposa desconocida; Dr. Fulano Figueroa y la Sociedad Legal de Bienes Gananciales compuesta entre éste y su esposa desconocida; Seguros Triple S, Inc.; S.I.M.E.D.; Continental Casualty, Co.<br><br>    Recurridos | CC-2011-315<br>CC-2011-327 | |

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES

En San Juan, Puerto Rico, a 9 de octubre de 2012.

Este caso nos permite pautar, por primera vez, que cuando un tribunal adjudique responsabilidad en un pleito de daños y perjuicios, debe incluir en su sentencia la porción de responsabilidad de todas las partes demandadas. Hay que hacerlo aunque algunos codemandados hayan llegado a una transacción confidencial con los demandantes. De igual forma, de concluirse que alguno de los codemandados no tiene responsabilidad, también debe hacerse constar.

Por otro lado, concluimos que cuando un demandado que permanece en un pleito de daños y perjuicios interesa que se revisen los efectos de un acuerdo de transacción confidencial que relevó a otros deudores solidarios, debe tomar acción conforme a las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. V, antes de que la sentencia de desestimación advenga final y firme.

Por último, aclaramos cómo debe computarse la compensación por daños, a la luz del precedente más reciente sobre ese tema.

I

Jesús Manuel Rodríguez Rodríguez tenía 28 años cuando comenzó a sufrir un viacrucis que se extendió durante cinco meses, mientras buscaba un tratamiento que le salvara la vida. La búsqueda resultó infructuosa. Falleció el 16 de marzo de 2005. Padecía de obesidad mórbida, reflejada en sus 400 libras de peso, hipertensión, diabetes y asma bronquial.

El 12 de octubre de 2004 Jesús Manuel acudió a la oficina del Dr. Oscar Hernández, su médico primario, porque le aquejaba un dolor en el lado derecho del abdomen. El galeno diagnosticó una infección en la orina y le dio de alta. Los dolores no cesaron. Diez días después, Jesús Manuel acudió a la sala de emergencias del Hospital Dr. Susoni en Arecibo. Se le evaluó y dio de alta con medicamentos.

Sin embargo, al día siguiente regresó. Un cirujano ordenó un CT abdomino-pélvico, pero no se pudo realizar porque la sala de emergencias del Hospital Dr. Susoni no contaba con el equipo para ello. Lo refirieron al Hospital Universitario, en el Centro Médico de Río Piedras, porque requería cirugía y en la institución arecibeña no se atrevían a intervenirle por su compleja condición de salud.

La certificación médica de traslado para el Centro Médico indicaba que la razón de la transferencia era una condición quirúrgica, a raíz de un diagnóstico de dolor abdominal. Además, daba cuenta de que el Hospital Dr. Susoni no tenía los recursos para estabilizar al paciente, hacer el diagnóstico adecuado y proveer el tratamiento especializado que requería. Por eso, se consideró más beneficioso enviarle al Centro Médico, aunque el traslado conllevara entre sus riesgos, un deterioro de la condición y una perforación.

En el Hospital Universitario no hicieron el CT abdomino-pélvico. Tampoco le operaron. Optaron por tratarle

por una infección en la orina. Estuvo allí tres días sin que se le ubicara en una habitación, a pesar de que se le admitió bajo el servicio de medicina interna. Recibió el tratamiento sentado en una silla de la sala de emergencias. Mientras, tenía las piernas hinchadas. Además, se quejaba de dolor en el costado y náuseas. Presentaba abdomen globoso, peristalsis disminuida, dolor abdominal, dolor en el flanco derecho con defensa, vómitos, fiebre y escalofríos.

El 26 de octubre de 2004 Jesús Manuel pidió a su padre, Alejandro Confesor Rodríguez Ramos, que lo sacara del Hospital Universitario y lo llevara a su casa porque sentía que en el hospital lo dejarían morir. Rodríguez Ramos así lo hizo. Contrario a las indicaciones médicas, se lo llevó para su residencia en Camuy.

Ante el continuo deterioro en la condición de Jesús Manuel, los familiares llamaron al médico de cabecera para que le atendiera en su casa. El galeno recomendó llevarlo nuevamente al hospital. El 30 de octubre llegó al Hospital Dr. Ángel Otero López, en Manatí. Allí le realizaron una placa de abdomen que reflejó que el intestino estaba distendido. Había presencia de aire y líquido en el cuadrante superior derecho de la cavidad abdominal, compatible con la existencia de una perforación.

Se le admitió al día siguiente bajo el cuido del Dr. Emilio Ramos Escoda, con un diagnóstico de asma bronquial, obesidad mórbida, diabetes mellitus por historial, y

tratamiento con antibióticos intravenosos. El 1 de noviembre de 2004 se le realizó un CT abdominal que reflejó una inflamación en el colon ascendente y abscesos (colecciones de pus) en tres lugares diferentes. El radiólogo consultado concluyó que esos hallazgos eran compatibles con una perforación del apéndice, divertículos o la enfermedad de Chron´s.

En sus determinaciones de hechos, el Tribunal de Primera Instancia concluyó que no fue hasta el 8 de noviembre que el doctor Ramos Escoda consultó con el radiólogo, Dr. Luis Rodríguez, y decidieron drenar el absceso que ubicaba alrededor del hígado (absceso perihepático) mediante un drenaje percutáneo. El drenaje se instaló el 9 de noviembre de 2004, a pesar de que se conocía de ese absceso desde el 1 de noviembre. Ese hallazgo se confirmó el 6 de noviembre con otro CT Scan que evidenció un aumento en la acumulación de pus en el área. El Tribunal de Primera Instancia creyó la prueba pericial de los demandantes, y concluyó que la acumulación de pus tenía como origen la infección, pues esta provocó una perforación intestinal que no se operó a tiempo.

El drenaje percutáneo mejoró la condición del paciente por unos días. Para el 11 de noviembre de 2004 había drenado 500 cc de pus. Dos días después le dieron de alta, con el drenaje instalado. Se programó una visita de seguimiento para el 22 de noviembre de 2004.

Aproximadamente dos días después de que se le diera de alta, el catéter del drenaje percutáneo se desprendió mientras bañaban al paciente en su casa. Su madre, la Sra. Hilda Rodríguez Olavarría, llamó a la oficina del doctor Ramos Escoda para informar lo sucedido. Se le indicó que lo dejaran así hasta la visita de seguimiento, que tendría lugar una semana después.

El 22 de noviembre de 2004, día de la visita de seguimiento con el doctor Ramos Escoda, Jesús Manuel no contaba con el dinero para pagar la consulta. La secretaria del galeno les indicó que si no tenían dinero no se atendería al paciente. Desde el desprendimiento del catéter la condición de Jesús Manuel retomó su deterioro.

Al día siguiente regresó a la sala de emergencias del Hospital Dr. Alejandro Otero López, con dificultad respiratoria, abdomen distendido, dolor abdominal, taquicardia y sepsis. Se le internó en la Unidad de Cuidado Intensivo, conectado a un ventilador, con un diagnóstico de empiema en el pulmón derecho. Esto es una infección que produce una colección de pus entre el pulmón y la membrana que lo reviste. Según la prueba que creyó el Tribunal de Primera Instancia, el empiema fue consecuencia de la infección intra-abdominal que se extendió a otras partes del cuerpo.

Jesús Manuel sufrió un fallo respiratorio el 24 de noviembre de 2004. Para tratar esa nueva complicación, se le realizó una decorticación, que es una cirugía mayor para

extirpar la corteza del pulmón, lo que requirió que se le removiera una costilla. Esta operación se realizó el 16 de diciembre. Se le dio de alta el 31 de diciembre de 2004.

Una vez en su casa, la condición de salud de Jesús Manuel continuó en retroceso. El Tribunal de Primera Instancia concluyó que se encontraba séptico, con el intestino perforado y dolor en el abdomen. Desarrolló úlceras por estar encamado, un proceso inflamatorio, abscesos y fascitis necronizante en los muslos.

El 25 de enero de 2005 regresó al Hospital Dr. Ángel Otero López. Allí quedó bajo el cuidado del doctor Félix Figueroa Pérez, quien limitó el tratamiento a los abscesos en los muslos, a pesar de que tenía conocimiento de la existencia de historial médico previo de Jesús Manuel en esa institución. También le realizó dos operaciones de debridación de las heridas en los muslos. Sin embargo, no solicitó acceso a los récords de las admisiones previas y que apuntaban a una infección intra-abdominal y estado séptico. El Tribunal de Primera Instancia creyó la versión de los demandantes de que el trato del Dr. Figueroa Pérez fue tan irrespetuoso, humillante y malcriado que llegó a utilizar palabras soeces hacia el paciente.

Al ver que el tratamiento que recibía Jesús Manuel no rendía frutos, su hermano, Alejandro Confesor Rodríguez Rodríguez, hizo gestiones para trasladarlo al Bridgeport Hospital en Connecticut. Se le admitió el 11 de febrero de 2005 con un diagnóstico de sepsis abdominal. A pesar de que

se le sometió a tratamiento, la infección estaba descontrolada, el paciente estaba inmunosuprimido y en un estado de deterioro físico que impidió su recuperación. Falleció el 16 de marzo de 2005, a los 29 años de edad.

Luego de evaluar los expedientes y testimonios de los peritos de ambas partes, el Tribunal de Primera Instancia concluyó que Jesús Manuel sufrió la perforación de un divertículo en el colon sigmoide, parte del intestino grueso. Aunque éste ubica en el lado izquierdo del abdomen, y el dolor del que se quejaba Jesús Manuel mientras estuvo en el Hospital Dr. Ángel Otero López era en el lado derecho, el tribunal dio credibilidad a los testimonios de los peritos de la parte demandante, y se convenció de que esa porción del intestino puede moverse libremente por la cavidad abdominal.

Además, el foro de primera instancia estimó que la perforación debió sellarse durante los meses de convalecencia de Jesús Manuel. Por ello, no se reflejó en la autopsia. Esta determinó que Jesús Manuel murió de fascitis necronizante, bronconeumonía bilateral, sepsis y una úlcera de cúbito infectada.

El 14 de marzo de 2006 el padre de Jesús Manuel, señor Rodríguez Ramos, la madre, señora Rodríguez Olavarría, por sí y en calidad de herederos de su hijo, y los hermanos Alejandro Confesor, Marisol y María del Carmen Rodríguez Rodríguez, demandaron para recobrar daños y perjuicios ocasionados mediante culpa, negligencia e impericia médica.

Incluyeron como demandados al Hospital Dr. Susoni; la Administración de Servicios Médicos de Puerto Rico (A.S.E.M.) como administradores de la sala de emergencias del Centro Médico; a los doctores Ramos Escoda, Figueroa Pérez, y sus respectivas sociedades legales de bienes gananciales; el Sindicato de Aseguradores para la Suscripción Conjunta de Seguro de Responsabilidad Médico Hospitalaria; el Hospital Dr. Alejandro Otero López; y sus respectivas aseguradoras.

Luego de la conferencia con antelación al juicio, los demandantes transigieron las reclamaciones contra el Hospital Dr. Susoni y la A.S.E.M., como administradora de la Sala de Emergencias del Centro Médico, mediante "Acuerdo privado y confidencial sobre transacción". Notificaron al Tribunal de Primera Instancia mediante "Moción de desistimiento voluntario parcial con perjuicio por transacción" en la que acreditaron que los acuerdos relevaron a los demandados liberados de la relación interna y externa entre deudores solidarios. El Tribunal de Primera Instancia ordenó mediante sentencia parcial que se sobreseyera y archivara el caso contra el Hospital Dr. Susoni el 24 de noviembre de 2008, y contra la A.S.E.M., el 2 de diciembre de 2008. Ambas sentencias advinieron finales y firmes hace más de tres años.

Tras la celebración del juicio, el Tribunal de Primera Instancia estimó los daños de Jesús Manuel en $500,000; a la Sra. Rodríguez Olavarría, el Sr. Rodríguez Ramos y al

Sr. Rodríguez Rodríguez en $225,000 cada uno; a Marisol Rodríguez Rodríguez se le concedieron $50,000. La otra hermana, María del Carmen Rodríguez Rodríguez, había abandonado la causa de acción por lo que no se le dio compensación alguna.

En su sentencia, el tribunal no dispuso a cuánto ascendía la responsabilidad por los daños que ocasionaron los demandados relevados, si alguno. Se limitó a responsabilizar al Dr. Ramos Escoda en un 80% de los daños y al Dr. Figueroa Pérez en un 20% de los daños. Al Hospital Dr. Alejandro Otero López se le condenó a responder solidariamente, por su responsabilidad vicaria. Los demandantes transigieron con esta institución hospitalaria luego de que iniciara el proceso apelativo.

Inconforme con la determinación del Tribunal de Primera Instancia, el Dr. Ramos Escoda acudió ante el Tribunal de Apelaciones. Señaló que el foro de primera instancia erró al imputarle el 80% de la responsabilidad por lo ocurrido y estimar los daños globales en $1,225,000. Además, alegó que el paciente y sus familiares fueron negligentes durante el tratamiento y rechazó que Jesús Manuel sufriera una perforación en su intestino. Por último, reclamó que se equivocó el Tribunal de Primera Instancia al no solicitar los acuerdos transaccionales para determinar los efectos que éstos pudieran tener en la relación interna y externa de los deudores solidarios.

El Tribunal de Apelaciones confirmó las determinaciones de hechos del Tribunal de Primera Instancia. Sin embargo, consideró que las cuantías concedidas como compensación fueron exageradamente altas. Redujo los daños de Jesús Manuel a $196,024.39; los de cada uno de sus padres a $125,956.09; los de su hermano a $75,000 y los de la hermana a $16,349.26. Para llegar a esa reducción utilizó precedentes nuestros en daños y perjuicios por impericia médica que estimó similares, en los que concedimos compensaciones a familiares, y realizó un cálculo para identificar el valor presente de las cuantías.

Inconformes con esa determinación, ambas partes recurrieron ante nos. Los demandantes piden que se reviertan las cuantías que concedió el Tribunal de Primera Instancia. El Dr. Ramos Escoda repitió los señalamientos de error que presentó ante el Tribunal de Apelaciones.

Expedimos el auto de *certiorari* en ambos recursos y ordenamos su consolidación. Con la comparecencia de ambas partes, estamos en posición de resolver.

II

El Art. 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5141, obliga a quien ocasione un daño por culpa o negligencia, a resarcir a la víctima. La imprudencia concurrente de esta última no la exime de responsabilidad, pero puede significar una reducción en la indemnización.

Una acción para exigir responsabilidad profesional a un médico no es distinta a la de un caso ordinario de daños y perjuicios por negligencia bajo el Art. 1802 del Código Civil, supra. Ortega *et al.* v. Pou *et al.*, 135 D.P.R. 711, 714 (1994). Por lo tanto, requiere que la parte demandante establezca por preponderancia de la evidencia, creída por el juzgador, que los actos de negligencia, falta de cuidado o impericia del médico causaron el daño emergente. Sáez v. Municipio de Ponce, 84 D.P.R. 535, 543 (1962).

Es norma reiterada en nuestra jurisdicción que cuando dos o más personas causan daño bajo el Art. 1802 del Código Civil, supra, todos serán solidariamente responsables frente a la persona perjudicada. US Fire Insurance v. A.E.E., 174 D.P.R. 846, 855 (2008); Rivera Hernández v. Comtec Comm., 171 D.P.R. 695, 710 (2007); Rivera v. Great Indemnity Co., 70 D.P.R. 825, 828 (1950); Cruz et al. v. Frau, 31 D.P.R. 92, 100 (1922).

Al ser solidaria la responsabilidad en caso de que haya más de un cocausante del daño, cada acreedor o deudor puede exigir la totalidad de la prestación, sin perjuicio de que posteriormente se recurra a la acción de nivelación entre los codeudores como método para ajustar cuentas. Art. 1098 del Código Civil, 31 L.P.R.A. 3109; S.L.G. Szendrey v. Hospicare, Inc., 158 D.P.R. 648, 654 (2003); L. R. Rivera Rivera, El contrato de transacción: sus efectos en situaciones de solidaridad, San Juan, Jurídica Editores, 1998, pág. 166. Esto es, en la relación externa, frente al

acreedor, cada cocausante es responsable por la totalidad de la deuda.

Pero al mismo tiempo existe entre cocausantes una relación interna, en que cada uno está supuesto a responder de acuerdo al grado de responsabilidad en el daño infligido. La excepción son los casos de insolvencia, en que toca distribuirse a prorrata la responsabilidad del insolvente entre los demás cocausantes. Art. 1098 del Código Civil, supra; S.L.G. Szendrey v. Hospicare, Inc., supra. La acción de nivelación pretende evitar el enriquecimiento injusto que surgiría si algún cocausante tiene que responder por el daño causado por otro, que tiene capacidad de pago. S.L.G. Szendrey v. Hospicare, Inc., íd.

### III

A. Luego de examinar el expediente de este caso, confirmamos la conclusión del Tribunal de Apelaciones de que el Tribunal de Primera Instancia no incurrió en pasión, prejuicio, parcialidad ni error manifiesto que amerite que alteremos sus determinaciones de hechos. La sentencia que emitió el foro primario denota una minuciosa ponderación de la prueba que presentaron todas las partes y dominio de la información sobre la condición de salud de Jesús Manuel Rodríguez Rodríguez, y su consecuente deterioro.

De esta forma, es correcta la decisión del foro intermedio de confirmar al Tribunal de Primera Instancia en su conclusión de que el doctor Ramos Escoda incurrió en mala práctica de la medicina al atender a Jesús Manuel. Su

manejo inadecuado del paciente mientras estuvo en sus manos fue la causa, en parte, de que la condición de salud del paciente se agravara sustancialmente.

El demandado solicita que reduzcamos el porciento de responsabilidad que se le imputó, para atribuir responsabilidad a la víctima y su familia por haber incurrido en negligencia concurrente. Tampoco vemos razón para intervenir con la determinación de hechos que hizo el Tribunal de Primera Instancia en ese extremo.

B.   Por otro lado, el doctor Ramos Escoda señala que los foros de instancia erraron al no solicitar copia de los acuerdos de transacción confidenciales a los que llegaron los demandantes con el Hospital Dr. Susoni y el Centro Médico. El demandado reclama que las cuantías que recibieron los demandantes por esos acuerdos deben reducirse del monto de daños concedidos.

Los demandantes rechazan que se divulguen los acuerdos. Acreditaron al tribunal que ambos son del tipo que avalamos en S.L.G. Szendrey v. Hospicare, Inc., supra. De esta forma, aseguran que lo recibido no se tiene que descontar del monto de responsabilidad que se imputó al doctor Ramos Escoda porque medió un relevo de responsabilidad en la relación interna y externa.

En Puerto Rico existe una fuerte política pública para promover que se transijan las controversias y evitar que lleguen a los tribunales porque se ahorra tiempo y dinero a

las partes involucradas, descongestionan los calendarios judiciales, y propenden al diálogo y paz entre los ciudadanos. <u>Carpets & Rugs v. Tropical Reps</u>, 175 D.P.R. 614, 629 (2009).

En los casos de daños y perjuicios, los demandantes pueden renunciar a la reclamación contra alguno de los cocausantes solidarios, o con todos, mediante contrato de transacción. <u>Sagardía de Jesús v. Hosp. Aux. Mutuo</u>, 177 D.P.R. 484, 498 (2009); <u>US Fire Insurance v. A.E.E.</u>, <u>supra</u>, pág. 855. Un contrato de transacción es un acuerdo mediante el cual las partes dan, prometen o retienen alguna cosa, con el propósito de evitar un pleito o poner término a uno que ya comenzó. Art. 1709 del Código Civil, 31 L.P.R.A. sec. 4821; <u>US Fire Insurance v. A.E.E.</u>, <u>supra</u>, pág. 853; <u>Blás v. Hospital Guadalupe</u>, 167 D.P.R. 439, 449 (2006). Los elementos característicos de un contrato de transacción son: (1) la existencia de una controversia o relación jurídica incierta litigiosa; (2) la intención de las partes de eliminar o superar esa controversia; y (3) concesiones recíprocas. <u>Sagardía de Jesús v. Hosp. Aux. Mutuo</u>, <u>supra</u>, pág. 498; <u>US Fire Insurance v. A.E.E.</u>, <u>supra</u>, pág. 853; <u>Blás v. Hospital Guadalupe</u>, <u>supra</u>, pág. 449; Rivera Rivera, <u>op cit.</u>, pág. 35.

Los efectos que tendrá un contrato para transigir la reclamación contra uno de varios cocausantes solidarios sobre los demás demandados dependerán de lo pactado. <u>Sagardía de Jesús v. Hosp. Aux. Mutuo</u>, <u>supra</u>, pág. 499; <u>US</u>

Fire Insurance v. A.E.E., supra, pág. 855; Szendrey v. Hospicare, Inc., supra, pág. 655.

Por ejemplo, puede que el contrato de transacción releve al codemandado con quien se transige frente al demandante, en la relación externa, y frente a los demás cocausantes al mismo tiempo. Los demandados que queden en el pleito no podrán traerle al pleito posteriormente porque el demandante asume la parte de la responsabilidad que corresponde al codemandado relevado, como ocurrió en el caso de Szendrey v. Hospicare, Inc. Véase, además, supra. US Fire Insurance v. A.E.E., supra, págs. 855-856.

También puede suceder que el demandante releve a un codemandado de la relación externa, mas no de la interna. En estos casos, los demás cocausantes podrán ir contra él en una acción de nivelación si fuera necesario. De no ser así, se suscitaría un enriquecimiento injusto. US Fire Insurance v. A.E.E., supra, págs. 856-858 y 860.

La transacción contenida en el contrato solo comprende "los objetos expresados determinadamente en ella, o que, por una inducción necesaria de sus palabras, deban reputarse comprendidos en la misma". Art. 1714 del Código Civil, 31 L.P.R.A. sec. 4826. Los contratos de transacción deben interpretarse de forma restrictiva. US Fire Insurance v. A.E.E., supra, pág. 854; Blás v. Hospital Guadalupe, supra, págs. 450-451. Por consiguiente, para auscultar cuáles son los efectos de un contrato de transacción, es necesario establecer primero qué fue lo que se pactó. Art.

1714 del Código Civil, _supra_, US Fire Insurance v. A.E.E., _supra_, pág. 855.

El contrato de transacción puede ser judicial o extrajudicial. Esta diferencia surge del Art. 1715 del Código Civil, 31 L.P.R.A. sec. 4827, que establece que un acuerdo de transacción tiene la autoridad de cosa juzgada para las partes, pero sólo procederá la vía de apremio cuando se trate de la transacción judicial.

Jurisprudencialmente, hemos definido que la transacción judicial se da cuando, una vez comenzado el pleito, las partes llegan a un acuerdo transaccional y lo hacen incorporar al proceso en curso. Ingravidez v. Ricci, 147 D.P.R. 1, 6 (1998); Neca Mortg. Corp. v. A&W Dev. S.E., 137 D.P.R. 860, 870-871 (1995). En cambio, una transacción extrajudicial resulta ser aquella que se celebra antes de que comience el pleito que se quiere evitar, o cuando una vez comenzado, las partes acuerdan una transacción sin la intervención del tribunal. Íd. En estos casos, bastará el mero aviso de desistimiento del pleito. Íd. Incluso, las partes pueden desistir del pleito sin siquiera mencionar el acuerdo logrado. J.R. Vélez Torres, Curso de Derecho Civil, San Juan, Ed. Rev. Jur. U.I.A.P.R., 1990, Tomo IV, Vol. II, pág. 498.

Al igual que en Puerto Rico, en España la jurisprudencia ha señalado que para que pueda considerarse una transacción como judicial, el acuerdo no solo tiene que darse una vez ha comenzado el pleito. También "se hace

necesario que se someta al conocimiento y aprobación del juzgador lo estipulado e incluso se afirma la necesidad de incorporarla al pleito iniciado". [Citas omitidas]. F.J. Orduña Moreno, El contrato de transacción, España, Thompson West, 2003, pág. 516. Se señala que la consecuencia de no incorporar el acuerdo a los autos del caso será que carezca de "sustancia procesal y no servirá de título para la ejecución en caso de incumplimiento". Orduña Moreno, íd, págs. 516-517. Ello se refiere a la vía de apremio a la que hace referencia el Código Civil.

> De lo dicho se concluye, por una parte, que transacción judicial no se hace equivaler con transacción que pone término a un procedimiento judicial en curso. Consiguientemente, será considerada transacción extrajudicial tanto aquella alcanzada fuera de los tribunales efectuada para evitar la provocación de un pleito, como aquella otra en la que por poner fin a uno ya comenzado, aunque sí tuvieron conocimiento de ella, por el contrario no se incorporó al proceso.

Íd., pág. 517.

En este caso, los demandantes llegaron a acuerdos transaccionales con dos de los demandados mediante un contrato confidencial cuyo contenido y detalles no revelaron al tribunal. Se limitaron a informar que se desistía del pleito contra ambos demandados porque llegaron a un acuerdo del tipo avalado en S.L.G. Szendrey v. Hospicare, Inc., supra.

Esto nos lleva a concluir que los acuerdos a los que llegaron las partes fueron extrajudiciales. Ninguno consta en los autos del caso ni tampoco se conocen los detalles de las prestaciones entre las partes. Lo único que se acreditó

al tribunal en las mociones de desistimiento fue que se relevó de la relación interna y externa a los codemandados liberados.

Sin embargo, ello no dispone de la petición que hace ante nos el doctor Ramos Escoda, para que solicitemos copia del acuerdo confidencial. Al hacer su solicitud, el doctor Ramos Escoda obvia el hecho de que el Tribunal de Primera Instancia emitió dos sentencias parciales finales para desestimar la causa de acción en contra del Hospital Dr. Susoni y de la A.S.E.M conforme a la Regla 42.3 de Procedimiento Civil. En ambas sentencias, del 24 de noviembre de 2008 y del 2 de diciembre del 2008, respectivamente, se hizo constar que los demandantes acreditaron que los codemandados con los que firmaron los acuerdos quedaron liberados de responder solidariamente tanto en la relación interna como en la externa. Por consiguiente, el Tribunal de Primera Instancia ordenó la liberación de ambos codemandados en su relación interna y externa con los demás codeudores solidarios y el demandante.

La Regla 42.3 de Procedimiento Civil, *supra*, permite a los tribunales dictar sentencias parciales finales cuando no existe razón para continuar con el pleito contra alguna de las partes. Esto ocurre antes de que concluya el pleito contra otra de las partes o reclamaciones que pervivan.

La Regla 47 de Procedimiento Civil, *supra*, señala que el término para pedir reconsideración de una sentencia u

orden es de 15 días, mientras que el término para apelar es de 30 días, ambos contados a partir de la fecha del archivo en autos de copia de la notificación, de acuerdo a la Regla 52.2 de Procedimiento Civil, 32 L.P.R.A. Ap. V.

En este caso ambas sentencias advinieron finales y firmes 30 días después de la fecha de archivo en autos de copia de la notificación de la sentencia sin que se solicitara reconsideración ni se apelara alguna de ellas, conforme a las Reglas 47 y 52.2 de Procedimiento Civil, supra.

Así pues, el demandado que permanece en el pleito no puede, mediante un señalamiento de error, pretender que alteremos subsidiariamente una sentencia que advino final y firme y sobre la que ya no tenemos jurisdicción. Acceder a su petición de solicitar los acuerdos firmados, para revisar los efectos que pudieran tener sobre la relación interna y externa entre los demás deudores solidarios, tendría el efecto simultáneo de revisar una sentencia parcial que advino final y firme hace más de tres años.

El Tribunal de Primera Instancia ya adjudicó, por sentencia final y firme, que las partidas que recibieron los demandados mediante los acuerdos transaccionales no tendrán consecuencias sobre la adjudicación de responsabilidad ni la partida que recaiga sobre el doctor Ramos Escoda. Por eso, no procede la solicitud de revisar el acuerdo para determinar sus consecuencias. Si el codemandado quería que el Tribunal de Primera Instancia

revisara los acuerdos confidenciales, debió solicitarlo antes de que recayera la sentencia parcial desestimatoria. También pudo solicitar revisión o apelar a tiempo la sentencia parcial final que recogió exactamente lo que los demandantes alegaron que contenían las transacciones. Al no hacerlo, se allanó a que se relevara al Hospital Dr. Susoni y la A.S.E.M. de la relación interna y externa, lo que hace impertinente que este foro ordene la revisión de los acuerdos.

C.   El doctor Ramos Escoda también señala que fue un error del foro primario determinar que el doctor Figueroa Pérez y él fueron los únicos que ocasionaron el 100% de los daños a Jesús Manuel y su familia. Resaltan que, la prueba desfilada denota que otros galenos e instituciones hospitalarias incurrieron en actuaciones que redundaron en daños. De esta forma, reclaman que es injusto que se les haga pagar el 100% de los daños determinados.

De la prueba que obra en el expediente, surge que los otros codemandados pudieron incurrir en actos u omisiones que causaron daños al paciente. Sin embargo, esto no se refleja en la sentencia del Tribunal de Primera Instancia, que concentró el 100% de la responsabilidad en los dos codemandados que no llegaron a acuerdos transaccionales, adjudicándole un 80% al doctor Ramos Escoda y un 20% al doctor Figueroa Pérez. En ese aspecto, consideramos que el Tribunal de Primera Instancia erró.

El que varios codemandados transigieran el pleito, en un acuerdo que los relevó de su responsabilidad interna y externa, no implica que se obvie el hecho de que pudieron ocasionar parte de los daños. La porción de responsabilidad de todos los originalmente demandados debe detallarse en la sentencia. Si se concluyera que alguno de los codemandados no incurrió en responsabilidad, debe hacerse constar también en la sentencia.

En US Fire Insurance v. A.E.E., supra, págs. 690-691, señalamos que la determinación judicial de responsabilidad debe indicar la porción exacta que corresponde a cada cocausante o, de lo contrario, se impondrá responsabilidad en cuotas iguales. Sin embargo, en esa ocasión también advertimos que eso no impide que las partes recurran a los mecanismos procesales disponibles para que se especifique el por ciento de responsabilidad de cada uno. Íd., pág. 861, esc. 4. La prueba que obra en el expediente de este caso, y la misma sentencia del Tribunal de Primera Instancia, nos impide concluir que todos los codemandados incurrieron en igual proporción de responsabilidad.

El Tribunal de Primera Instancia debe aclarar qué porción de responsabilidad corresponde a cada uno de los demandados, incluyendo a los que transigieron el pleito. En la sentencia debe hacerse constar la porción de responsabilidad de cada codemandado, y restarse los porcientos correspondientes a los codemandados liberados

mediante transacción total de las cuantías estimadas de daños.

IV

Hemos reiterado que los tribunales apelativos no debemos intervenir con las determinaciones de los juzgadores de primera instancia, salvo que medie pasión prejuicio, parcialidad o error manifiesto en la apreciación de la prueba. Serrano Munoz v. Auxilio Mutuo, 171 D.P.R. 717, 741 (2007); Álvarez v. Rivera, 165 D.P.R. 1, 25 (2005); Rodríguez v. Concreto Mixto, Inc., 98 D.P.R. 579, 593 (1970).

En los casos de daños y perjuicios, específicamente, hemos reconocido que la tarea judicial de estimar y valorar los daños resulta difícil y angustiosa porque no existe un sistema de computación que permita llegar a un resultado exacto con el cual todas las partes queden completamente complacidas. Herrera, Rivera v. S.L.G. Ramírez-Vicéns, 179 D.P.R. 774, 784 (2010); Sagardía de Jesús v. Hosp. Aux. Mutuo, supra, pág. 509; Velázquez Ortiz v. U.P.R., 128 D.P.R. 234, 236 (1991)(Sentencia).

Es por ello que los foros apelativos guardarán deferencia a las valorizaciones de daños que hagan los foros de primera instancia, porque son éstos los que tienen contacto directo con la prueba testifical y quedan en mejor posición para emitir un juicio. Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, pág. 784; Sagardía de Jesús v. Hosp.

Aux. Mutuo, supra, pág. 509; Velázquez Ortiz v. U.P.R., supra, pág. 236.

De esta forma, nos hemos apegado a la norma de que no intervendremos con las estimaciones de daños que haga el Tribunal de Primera Instancia, salvo cuando la cuantía que se conceda sea exageradamente alta o ridículamente baja. Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, págs. 784-785. Sagardía de Jesús v. Hosp. Aux. Mutuo, supra, págs. 509-510; Velázquez Ortiz v. U.P.R., supra, págs. 236.

Al revisar una sentencia del Tribunal de Primera Instancia que concedió daños, los foros apelativos deben considerar la prueba desfilada y concesiones otorgadas en casos similares resueltos anteriormente. A pesar de que reconocemos que cada caso es distinto y tiene circunstancias particulares, los precedentes son referencia útil para la determinación de si la compensación es exageradamente alta o ridículamente baja. Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, pág. 785.

Los demandantes recurren ante nos para que restituyamos la compensación por daños que concedió el Tribunal de Primera Instancia y que redujo el Tribunal de Apelaciones.

El foro primario concedió a los demandantes una partida global ascendente a $1,225,000. De esa cifra, $500,000 correspondían a los daños que sufrió Jesús Manuel antes de morir. Además, se concedieron $225,000 a cada uno de sus progenitores y una cifra igual a su hermano, quien

el Tribunal de Primera Instancia destacó que demostró un alto compromiso y dedicación para cuidar a Jesús Manuel durante los meses de convalecencia. A la otra hermana que permaneció en el pleito le asignaron $50,000.

Sin embargo, el Tribunal de Apelaciones determinó que la cantidad que concedió el Tribunal de Primera Instancia era exageradamente alta. Determinó reducirla a una cifra global de $539,285.83. Esa cifra se distribuye en $196,956.39 por los daños que sufrió Jesús Manuel y $125,956.09 para cada uno de sus progenitores. La partida que se concedió a su hermano, Alejandro Rodríguez Rodríguez, se redujo a $75,000. A Marisol Rodíguez Rodríguez, la hermana, le correspondieron $16,349.26.

Para llegar a esas cuantías, el foro apelativo intermedio se dejó llevar por el procedimiento que adoptamos en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra. A su vez, en ese caso, adoptamos el método que recomendó el ex juez Antonio J. Amadeo Murga. Véase A.J. Amadeo Murga, El valor de los daños en la responsabilidad civil, 1ra ed., San Juan, Ed. Esmaco, 1997, T.1, págs. 91-116. Así, instruimos a tomar en consideración compensaciones otorgadas en precedentes judiciales, actualizándolas al valor presente.

En ese ejercicio de actualizar partidas al valor presente, utilizamos el cambio que ha tenido el poder adquisitivo del dólar a través del tiempo, que se basa en el índice de precios al consumidor, para obtener el ajuste

por inflación, acorde con la recomendación del tratadista en ese momento. Amadeo Murga, op cit., 1ra ed., págs. 91 y 100-102. Luego, se hizo un ajuste adicional por el crecimiento en la economía ocurrido entre la sentencia que se utiliza como comparación y la fecha en que se dicta la sentencia en el caso que se evalúa en la actualidad. Amadeo Murga, op cit., págs. 102-105.

El valor adquisitivo del dólar se deriva del índice de precios al consumidor. El Departamento del Trabajo y Recursos Humanos, adoptó en el 2009 un nuevo índice de precios al consumidor, que utiliza como año base el 2006, y dejó atrás la versión anterior que utilizaba el 1984 como año base.[1] Ese nuevo índice de precios se desarrolló en colaboración con el Negociado de Estadísticas del Departamento del Trabajo Federal. El libro de Amadeo Murga que utilizamos como referencia en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, se valía del índice de precios que usaba el 1984 como año base.

El índice de precios al consumidor es la herramienta que utiliza el Departamento del Trabajo y Recursos Humanos para medir los cambios en el costo de vida en Puerto Rico.[2]

---

[1] Disponible a través de la página cibernética del Instituto de Estadísticas de Puerto Rico: http://www.estadisticas.gobierno.pr/iepr/Estadisticas/Bases dedatos/Econom%C3%ADa.aspx#IPC. (Última visita 5 de junio de 2012.)

[2] Informe a la Junta de Directores sobre la concatenación del Índice de Precios al Consumidor, 6 de diciembre de 2009, pág. 1. Disponible en: http://cce.estadisticas.gobierno.pr/Documentos/99DBD8CE-B1BB-4D2C-A2FC-3D52ED53346D/comunicado 20091206.pdf (Última visita 20 de junio de 2012).

Surge de una serie de modelos estadísticos, entre los que se encuentra la canasta de artículos y servicios. Esta canasta resulta ser una descripción de los gastos usuales en los que incurre una familia típica en Puerto Rico en determinado momento, a los precios que los venden en los lugares en que usualmente los adquieren.[3] También considera los ingresos.[4] Véase, además, A.J. Amadeo Murga, El Valor de los daños en la responsabilidad civil, 2da ed., España, Bosch Editor, 2012, págs. 70-71. Es decir, con el cambio en el año base se reconsideran los artículos que se incluyen en esa canasta de artículos y servicios, acorde con los cambios en el consumo de la población. J.J. Álvarez González y L.M. Pellot Juliá, Responsabilidad Civil Extracontractual, 81 Rev. Jur. UPR 661 (2012) (en prensa). M.Z. Olmo Quiñones y J.A. Villeta Trigo, Revisión del Índice de Precios al Consumidor, 54 Revista del Trabajo 46, Tomo 19 (Abril 2008).

Recientemente, Amadeo Murga publicó una nueva edición de su libro. En ella desfavorece el nuevo índice de precios al consumidor. Su reserva consiste en que, según su análisis, con el nuevo índice el costo de vida en Puerto Rico resulta más bajo que en Estados Unidos lo que entiende contrasta con la realidad. Amadeo Murga, El valor de los daños en la responsabilidad civil, 2da ed., op cit., págs. 71-72. El tratadista en su nueva edición prefiere utilizar

---

[3] Íd., pág. 1.
[4] Íd., pág. 6.

el producto bruto per cápita como herramienta para traer al valor presente partidas concedidas en el pasado. Amadeo Murga señala que la Junta de Planificación publica consistentemente ese índice, y toma en consideración el aumento por inflación y el aumento por el nivel de vida. Amadeo Murga, op cit., 2da ed., pág. 72.[5]

Sin embargo, al mismo tiempo Amadeo Murga reconoce que **el índice de precios al consumidor es el mecanismo que más frecuentemente se utiliza para computar el valor relativo de la moneda**. Amadeo Murga, supra, 2da ed., pág. 70. Por ello, no lo descarta como alternativa, aunque recomienda que si se opta por continuar con su uso, se haga un ajuste adicional por el crecimiento económico. En la primera edición de su libro, esa segunda parte del proceso se reservó para cuando se traían partidas concedidas muchos años antes. Véase, Amadeo Murga, op cit., 2da ed., pág. 72; Amadeo Murga, op cit., 1ra ed., págs. 102-105.

En contraste, otros tratadistas continúan utilizando el índice de precios al consumidor para actualizar al valor

---

[5] Cabe destacar que, según el boletín de "Actividad SocioEconómica de Puerto Rico" que publica la Junta de Planificación, el Producto Bruto es el valor en el mercado de la producción económica que originan los residentes de Puerto Rico. Actividad SocioEconómica de Puerto Rico, Junta de Planificación, Volumen IV Número 5, Mayo 2012, pág. 4. Esa definición es cónsona con la que provee Amadeo Murga, quien indica que "[e]l índice representa el conjunto de bienes y servicios producidos por los ciudadanos de Puerto Rico, dividido entre el número de habitantes a precios corrientes". Amadeo Murga, op cit., 2da ed., pág. 72. Es decir, mientras el Producto Bruto mide la producción de una localidad, el índice de precios al consumidor mide el consumo.

presente compensaciones concedidas en el pasado y desfavorecen la segunda parte del proceso para hacer un ajuste adicional por el crecimiento económico. Incluso, sostienen esta posición al considerar el nuevo índice de precios al consumidor, con el 2006 como año base. Véase Álvarez González y Pellot Juliá, supra.

El profesor Álvarez González no ve justificación para que se añada una segunda parte al proceso de actualizar al valor presente cifras concedidas en el pasado cuando se utiliza el índice de precios al consumidor, como propone Amadeo Murga. Sus reservas a la segunda parte del proceso se basan en que el índice de precios al consumidor ya considera el crecimiento económico, y hacer un cálculo adicional significaría compensar más a las víctimas presentes, y sus familiares, que a las del pasado. Álvarez González y Pellot Juliá, supra.

Según Amadeo Murga, la segunda parte del proceso, que en la primera edición de su libro se reservaba para aquellos casos que datan de mucho tiempo atrás, tiene el propósito de hacer un ajuste adicional "para adecuar la compensación a una economía que goza de un nivel o estándar de vida mayor". Entendemos que esa adecuación se hace innecesaria cuando, conjunto con el año base, se actualiza la canasta de bienes y servicios de la que se obtiene el índice de precios al consumidor, que evalúa los cambios en los ingresos, así como en los artículos y servicios que se consumen. Es recomendable que se haga una revisión del

índice de precios cada diez años. Olmo Quiñones y Villeta Tribo, _supra_, pág. 47. Como enfatizan el profesor Álvarez González y Pellot Juliá:

> Tenemos dudas sobre la justificación de hacer ese segundo cómputo. Recuérdese que de lo que se trata es de conceder una partida por daños morales -que carecen de valor económico intrínseco que refleje una suma que compense esos daños, con vista a las ejecutorias judiciales pasadas. No comprendemos por qué deba hacerse un cómputo distinto y adicional al que pretende conceder hoy un valor comparable al que se concedió ayer por sufrimientos de intensidad y consecuencia psíquica similares. El único fundamento que podría justificar un cómputo adicional basado en la mayor calidad de vida actual en comparación con el pasado es que la intensidad del sufrimiento moral aumenta según la sociedad progresa. Esa premisa no parece justificable; no creemos que pueda decirse que la intensidad del sufrimiento moral de una persona tenga relación alguna con ese progreso. Pensamos que el sufrimiento de un padre o madre por la pérdida de un hijo, por ejemplo, presumiendo que exista una relación afectiva similarmente estrecha, no varía de época en época.

J.J. Álvarez González y L.M. Pellot Juliá, _supra_.

Esto nos lleva a concluir que cuando utilizamos un índice de precios al consumidor cuyo año base es reciente, como en este caso, se hace innecesario el ajuste correspondiente al crecimiento económico que señala el profesor Amadeo Murga como segunda parte del proceso de actualización de las partidas concedidas cuando se utiliza el índice de precios al consumidor.

Es obvio que no hay consenso entre los expertos del tema sobre qué método utilizar para actualizar partidas concedidas en el pasado. Depende de la fiabilidad que a cada uno le merezcan las diferentes estadísticas que proveen las fuentes oficiales. En esta opinión optamos por

apegarnos a la que utiliza el índice de precios, que fue la estadística oficial que ya adoptamos en el pasado, con las modificaciones señaladas, que también han avalado expertos y economistas.

Si del proceso de actualización de cifras resultan cuantías que consideramos muy bajas, puede responder a que las concedidas en el pasado también eran muy bajas. Véase Álvarez González y Pellot Juliá, supra. Ahora concedemos lo que corresponde de acuerdo a las circunstancias particulares del caso. Por eso avalamos las compensaciones del Tribunal de Primera Instancia, que eran sustancialmente superiores a los precedentes judiciales.

Somos conscientes de que la Opinión Concurrente y Disidente de la Juez Asociada señora Rodríguez Rodríguez favorece la nueva metodología que propone el ex juez Amadeo Murga. Respetamos su criterio porque reconocemos que entre los economistas y expertos del tema no hay consenso y el método por el que opta la Opinión Concurrente y Disidente es uno de ellos. Sin embargo, peca de hacer lo mismo que critica.

En primer lugar, la crítica parte de la premisa equivocada de que con el método que adoptamos en esta Opinión descartamos lo resuelto en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra. En verdad hoy no descartamos a Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, sino que lo modificamos siguiendo las recomendaciones de tratadistas y expertos en la materia. Irónicamente, al seguir la

recomendación de Amadeo Murga, la Opinion Concurrente y Disidente modifica también el análisis que seguimos en aquel precedente judicial.

En el libro de texto en que se basó Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, la primera edición de El valor de los daños en la Responsabilidad Civil, supra, la segunda parte del análisis para actualizar al valor presente cifras concedidas en el pasado **no era mandatoria** en todos los casos. Se reservaba para los casos en que se traían al valor presente cifras concedidas muchos años antes. Amadeo Murga, op cit., 1ra ed., págs. 102-105. El ex juez Amadeo Murga, en su tratado, ni siquiera precisaba cuántos años tenían que pasar entre una compensación y otra para que se utilizara esa segunda parte del proceso. Con el índice de precios al consumidor actualizado, como vimos, esa segunda parte del análisis, opcional en sus orígenes, se hace innecesaria.

Nótese que el índice de precios al consumidor sigue siendo la base de nuestro análisis, como en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra. En contraste, la Opinión Concurrente y Disidente sigue la recomendación más reciente del tratadista Amadeo Murga, en que se adopta como base del análisis el producto bruto per cápita y descarta el índice de precios al consumidor. Con él, se descarta también la base del análisis utilizado en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra. Ahora, "sin sujeción a lo establecido por este Tribunal", utiliza un índice que no se

había considerado en nuestros precedentes judiciales. Op. Concurrente y Disidente emitida por la Juez Asociada señora Rodríguez Rodríguez, pág. 18.

De esto queda claro que es ineludible modificar el análisis que inauguramos en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra. Los precedentes pueden cambiarse cuando del análisis surge que el precedente judicial era (1) claramente erróneo; (2) sus efectos sobre el resto del ordenamiento son adversos; y (3) la cantidad de personas que confían en la decisión es limitada. Fraguada Bonilla v. Hospital Auxilio Mutuo, Op. de 13 de agosto de 2012; 2012 T.S.P.R. 126; 2012 J.T.S. 139; 186 D.P.R. ___ (2012); Pueblo v. Delgado, 175 D.P.R. 1 (2008); González v. Merck, 166 D.P.R. 659, 688 (2006) (Hernández Denton, J., Op. Conformidad). En este caso, se desprende de nuestro análisis y del que esboza la Op. Concurrente y Disidente emitida por la Juez Asociada señora Rodríguez Rodríguez que el precedente judicial es erróneo. De las alternativas disponibles, preferimos recurrir a las estadísticas oficiales que reúnen los economistas y no las que corresponden a la preferencia personal de ningún autor.

No podemos olvidar que con este ejercicio no pretendemos desarrollar una ciencia exacta pues, después de todo, lo que buscamos es un estimado, ya que no existe un sistema de computación con el que todas las partes queden satisfechas. Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, pág. 784.

En el caso bajo análisis, el Tribunal de Apelaciones hizo un esfuerzo por seguir el mismo proceso que avalamos en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra. Sin embargo, erró en varios aspectos, por lo que determinamos revocar la reducción de las cuantías que concedió el Tribunal de Primera Instancia. A continuación explicamos cada una de las partidas.

**Jesús Manuel Rodríguez Rodríguez**

Para reducir la cuantía de $500,000 que concedió el Tribunal de Primera Instancia, el foro apelativo intermedio estableció un paralelismo con la cuantía que concedimos en Colón v. Municipio de Guayama, 114 D.P.R. 193 (1983). Al revisar esa comparación, nos topamos con dos inconvenientes. El primero es que aunque el Tribunal de Apelaciones hizo un esfuerzo por seguir lo que instruimos en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, erró en su aplicación. Segundo, hay ciertas diferencias entre ambas situaciones de hechos que deben reflejarse en la compensación. Esto nos lleva a concluir que la compensación que otorgó el Tribunal de Primera Instancia no fue exageradamente alta, como concluyó el Tribunal de Apelaciones.

Por un lado, adolece de errores el procedimiento que siguió el foro apelativo intermedio para traer al valor presente la cuantía de $25,000. El primero de ellos es que multiplicó las cuantías concedidas antes de 1984 por 2.82,

como si ese índice fuera de aplicación genérica. Lo cierto es que en Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, utilizamos un valor adquisitivo para el dólar de $2.82 en el primer paso porque era ese el índice que, según Amadeo Murga, correspondía al ejercicio de llevar una cifra de 1963, año del caso con el que se comparaba, al año base de 1984.

El caso que el Tribunal de Apelaciones utilizó como referencia es de 1983, por lo que, según Amadeo Murga, el índice que debió utilizarse para llevar la compensación al año base de 1984 era $1, no un valor adquisitivo de $2.82 por dólar. Además, erró el Tribunal de Apelaciones al asignarle a diciembre de 2009 un valor adquisitivo de $0.82 al dólar como segunda parte del proceso.

Si bien es cierto que las estadísticas del Departamento del Trabajo y Recursos Humanos para diciembre de 2009 adjudicaron $0.82 al valor adquisitivo del dólar ese mes, ese valor utilizaba el 2006 como año base, no el 1984, año en que se fundamentó la primera parte del análisis de actualización de la compensación al valor presente. El uso de dos años base distintos ocasiona un desfase obvio en el análisis.

Para seguir la primera parte del análisis que ilustra Amadeo Murga, si utilizamos como primer ejemplo el caso que escogió el Tribunal de Apelaciones, tenemos que buscar el valor adquisitivo del dólar para 1983 y multiplicarlo por la cifra que concedimos en ese caso, que fue de $25,000. Si

el índice de precios al consumidor para 1983 era de 62.27, ello significa que el valor adquisitivo del dólar era de $1.61.[6] Esto resulta en $40,250 que sería el ajuste por inflación de los $25,000 para el año base utilizado, es decir, el 2006.

El segundo paso de la primera parte del análisis exige que se actualice esa cantidad para llevarla al año en que se dictó sentencia, que en nuestro caso es el 2009. Para lograrlo, se tiene que dividir ese producto, $40,250, entre el valor adquisitivo del dólar para 2009, que fue de $0.93.[7] Eso arroja $43,279 como resultado.

Ciertamente, una compensación de $43,279 para una persona que, como Jesús Manuel, sufrió durante más de 140 días a consecuencia de una cadena de actos de impericia médica, resulta ridículamente baja. Encontramos que ello obedece al contraste en el tiempo que se extendió la agonía de cada uno. En Colón v. Municipio de Guayama, supra, la víctima de 23 años recibió el golpe de un camión de plataforma, que le "desbarató la columna vertebral,

---

[6] Para calcular el valor adquisitivo del dólar dividimos uno (1) entre el índice de precios al consumidor seleccionado. Así obtenemos el mismo valor adquisitivo del dólar que provee el Departamento del Trabajo y Recursos Humanos en sus boletines mensuales. Somos conscientes de que el artículo del profesor Álvarez utiliza 98 centésimas (0.98) como factor para calcular el valor adquisitivo del dólar, correspondiente al año base 2006. Sin embargo, optamos por apegarnos al factor que coincide con el cálculo que publica el Departamento del Trabajo y Recursos Humanos.

[7] El valor adquisitivo del dólar para 2009 se obtuvo de la división de uno (1) entre el índice de precios al consumidor para ese año, ascendente a 107.81, con el 2006 como base.

dejándole parapléjico, y le produjo una contusión cerebral, se mantuvo consciente todo el tiempo, hasta diez días más tarde, cuando falleció… Los récords de su hospitalización revelan un angustioso cuadro de un joven aquejado de profundos dolores, consciente de que su muerte era inevitable…". Colón v. Municipio de Guayama, supra, pág. 196.

Si bien ambos pacientes padecieron inmenso dolor físico, y eran conscientes de que su vida peligraba, no podemos perder de perspectiva que el sufrimiento de Jesús Manuel se prolongó por más de 140 días. Tal vez la víctima en Colón v. Municipio de Guayama, supra, tuvo un sufrimiento más intenso, pero se extendió durante diez días. El tiempo por el que un paciente sufre el daño es un elemento que debemos tomar en consideración. Colón v. Municipio de Guayama, supra, pág. 204.

Es prudente considerar las compensaciones otorgadas en otros casos para ampliar nuestro panorama, sin olvidar que ningún caso es exactamente igual a otro. En Toro Aponte v. E.L.A., 142 D.P.R. 464 (1997) concedimos una compensación de $150,000 a una víctima de impericia que tuvo dentro de su abdomen una gasa quirúrgica que se dejó allí inadvertidamente luego de una cesárea. El error médico le provocó una infección por la que padeció vómitos, diarreas y un dolor irresistible en el abdomen. Se le tuvo que someter a una colostomía para remover parte del intestino

grueso, que quedó perforado cuando se removió la gasa que infectó toda el área que la circundaba.

Esos $150,000 que concedimos en 1997, ajustados al valor presente según el método adoptado, representarían $198,387.[8] Nuevamente, tenemos que considerar que en Toro Aponte v. E.L.A., supra, el sufrimiento de la víctima se prolongó durante un mes. Otro elemento que debemos considerar en nuestro análisis es que la paciente sobrevivió la experiencia traumática.

En Morales v. Hosp. Matilde Brenes, 102 D.P.R. 188 (1974), compensamos a una víctima de impericia médica con $39,000 por los sufrimientos que padeció durante tres días, porque no se le diagnosticó adecuadamente una apendicitis.[9] El paciente sobrevivió. El valor presente de esa cuantía, según el procedimiento adoptado, sería $109,032.

Los casos reseñados nos llevan a concluir que la compensación de $500,000 que concedió el Tribunal de

---

[8] Para traer la cifra de $150,000 al valor presente ajustada a la inflación, la multiplicamos por el valor adquisitivo del dólar para el año de la sentencia, que fue de $1.23. Ese valor adquisitivo del dólar surge de la división de uno (1) entre el índice de precios al consumidor para el 1997, que fue de 81.14.

El producto, $184,500, se divide entre el valor adquisitivo del dólar para el año en que se resolvió el caso que hoy revisamos, que es $0.93 (uno dividido entre el índice de precios al consumidor para el 2009, que fue 107.81). De esa forma, el ajuste por inflación elevaría los $150,000 de 1997 a $198,387 en el 2009.

[9] El valor adquisitivo del dólar para 1974 es $2.60, que se multiplican por los $39,000 que se otorgaron como compensación para luego dividirlos entre $0.93. Así que el ajuste por inflación representa una cifra de $109,032.

Primera Instancia en el caso de Jesús Manuel, por los sufrimientos que padeció durante casi cinco meses, no fue exageradamente alta, como concluyó el Tribunal de Apelaciones.

## Alejandro Rodríguez Ramos e Hilda Rodríguez Olavarría

En el caso de los progenitores de Jesús Manuel, el Tribunal de Primera Instancia concedió $225,000 a cada uno. Luego del análisis que realizó el Tribunal de Apelaciones, esa cifra se redujo a $125,956.09.

El foro apelativo intermedio utilizó como marco de comparación Hernández v. La Capital, 81 D.P.R. 1031 (1960). En ese caso, concedimos $15,000 a la madre de una niña que murió en el hospital ahorcada con el cordón de su ropa de dormir, como consecuencia de la supervisión indebida del hospital. Esos $15,000, que se concedieron a la madre por la muerte de la menor, la pérdida de su compañía y afecto, equivaldrían hoy a $76,129, según el método utilizado.[10] A diferencia del caso ante nos, en que el sufrimiento de Jesús Manuel duró casi cinco meses, allí la niña murió casi instantáneamente.

En un caso más reciente, Sagardía de Jesús v. Hosp. Aux. Mutuo, supra, concedimos $400,000 al padre y $300,000

---

[10] El valor adquisitivo del dólar para 1960 es $4.72, que se multiplican por los $15,000 que se otorgaron como compensación para luego dividirlos entre $0.93. Así que el ajuste por inflación representa una cifra de $76,129.

a la madre de un bebé recién nacido quien, durante un mes, batalló por sobrevivir a un acto de impericia médica cometido al momento del alumbramiento. La sentencia del Tribunal de Primera Instancia en ese caso fue de 2004, por lo que el valor presente sería $486,022 y $364,516, respectivamente.[11]

Tenemos que ponderar que a diferencia de los dos casos traídos como comparación, en el caso que evaluamos hoy la víctima era un joven que sufrió en agonía durante casi cinco meses. Aunque la muerte de un hijo amado siempre ocasionará un dolor inmensurable, la agonía lenta aumenta el sufrimiento de sus progenitores. Eso debe pesar en nuestro análisis.

Con esos elementos en mente, también tenemos que concluir que la compensación que otorgó el Tribunal de Primera Instancia a los padres de Jesús Manuel, Alejandro Rodríguez Ramos e Hilda Rodríguez Olavarría, no fue exageradamente alta.

**Alejandro Confesor y Marisol Rodríguez Rodríguez**

El Tribunal de Primera Instancia concedió al hermano de Jesús Manuel, Alejandro Confesor Rodríguez Rodríguez, una partida idéntica a la de sus padres, $225,000. Destacó que la prueba que desfiló durante el juicio evidenció el

---

[11] El valor adquisitivo del dólar para 2004 es $1.13, que se multiplican por $400,000 y $300,000 que se otorgaron como compensaciones a los padres, para luego dividirlos entre $0.93. Así que el ajuste por inflación representa una cifra de $486,022 y $364,516, respectivamente.

apego y dedicación que demostró durante la convalecencia de Jesús Manuel. A otra de sus hermanas, Marisol Rodríguez Rodríguez, le asignó una compensación de $50,000. A María del Carmen no se le concedió compensación porque abandonó la causa de acción.

El Tribunal de Apelaciones también redujo las compensaciones de los hermanos. A Alejandro Confesor le concedió $75,000 y a Marisol, $16,349.26. Ese foro inició su análisis con Ortiz Martínez v. Great Ame. Ind. Co., 83 D.P.R. 306 (1961). En ese caso, concedimos $2,000 a cada uno de los hermanos de un joven de 18 años que murió en un accidente automovilístico. El valor presente de esa cuantía es $9,914.[12]

Luego de evaluar ese caso, el Tribunal de Apelaciones se distanció de este precedente para hacer un reconocimiento de la dedicación, compromiso y amor que desplegó Alejandro Confesor Rodríguez Rodríguez hacia su hermano. Por ello, compensó su pérdida por una cuantía mayor a la de su hermana, apartándose de Ortiz Martínez v. Great Ame. Ind. Co., supra.

Por otro lado, en Velázquez Ortiz v. U.P.R., supra, concedimos $10,000 a cada uno de los dos hermanos de un menor de dos años y medio. La hermana tenía 14 años y el hermano 9 años al momento del deceso. Las circunstancias de

---

[12] El valor adquisitivo del dólar para 1961 es $4.61, que se multiplican por los $2,000 que se otorgaron como compensación para luego dividirlos entre $0.93. Así que el ajuste por inflación representa una cifra de $9,914.

la muerte del menor no surgen con claridad de la sentencia, más allá de aseverarse que nació prematuramente, era enfermizo y que su fallecimiento fue consecuencia de actos de impericia médica que cometieron los demandados. El valor presente de los $10,000 sería unos $14,731 aproximadamente, según el método señalado.[13]

Nuevamente, tenemos que reconocer las diferencias entre los casos evaluados y el que hoy nos ocupa. El caso de Jesús Manuel fue mucho más prolongado. En cuanto a Marisol Rodríguez Rodríguez, el Tribunal de Apelaciones redujo a $16,349.26 la cuantía de $50,000 que había concedido el Tribunal de Primera Instancia. En los casos citados como referencia vemos que las compensaciones otorgadas a hermanos, traídas al valor presente, fluctúan entre $9,900 y $15,000. Es por esto que una partida de $50,000 como la que concedió el foro de instancia no es exageradamente alta, considerando el tiempo que convaleció Jesús Manuel.

En el caso de Alejandro Confesor Rodríguez Rodríguez, el Tribunal de Primera Instancia destacó su sacrificio y el compromiso que asumió de buscar alternativas para salvar la vida de su hermano. Incluso, estuvo continuamente a su lado, le dio apoyo emocional y gestionó su admisión en un hospital de Connecticut, donde finalmente Jesús Manuel

---

[13] El valor adquisitivo del dólar para 1991 es $1.37, que se multiplican por los $10,000 que se otorgaron como compensación a cada hermano, para luego dividirlos entre $0.93. Así que el ajuste por inflación representa una cifra de $14,731.

murió. En este extremo optamos por dar también deferencia a la cuantía que concedió el Tribunal de Primera Instancia.

V

Por los motivos antes expuestos, restituimos las compensaciones por daños que otorgó el Tribunal de Primera Instancia. Es decir, $500,000 para Jesús Manuel; $225,000 para la Sra. Rodríguez Olavarría, el Sr. Rodríguez Ramos y el Sr. Rodríguez Rodríguez, cada uno; y $50,000 a Marisol Rodríguez Rodríguez.

Al mismo tiempo, devolvemos el caso al Tribunal de Primera Instancia para que detalle la porción de responsabilidad en que incurrió cada uno de los demandados, aunque hayan transigido su responsabilidad, y lo desglose así en la sentencia. La porción de responsabilidad de los demandados relevados de responsabilidad interna y externa, si alguna, debe restarse proporcionalmente de la partida de compensación de daños adjudicada.

Se dictará Sentencia de conformidad.


                              RAFAEL L. MARTÍNEZ TORRES
                                    Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Alejandro Confesor Rodríguez Ramos; Hilda Rodríguez Olavarría; Marisol, Alejandro Confesor y María del Carmen Rodríguez Rodríguez<br><br>Peticionarios<br><br>v.<br><br>Hospital Dr. Susoni Inc., Administración de Servicios Médicos de P.R. (A.S.E.M.); Hospital Dr. Alejandro Otero López, Inc., Dr. Emilio Ramos Escoda (Apelante) y la Sociedad Legal de Bienes Gananciales compuesta entre éste y su esposa desconocida; Dr. Oscar Hernández y la Sociedad Legal de Bienes Gananciales compuesta por éste y su esposa desconocida; Dr. Samuel A. Amill y la Sociedad Legal de Bienes Gananciales compuesta entre éste y su esposa desconocida; Dra. Sheila González y la Sociedad Legal de Bienes Gananciales compuesta entre ésta y su esposo desconocido; Dr. Luis Rodríguez Rodríguez y la Sociedad Legal de Bienes Gananciales compuesta entre éste y su esposa desconocida; Dr. Fulano Figueroa y la Sociedad Legal de Bienes Gananciales compuesta entre éste y su esposa desconocida; Seguros Triple S, Inc.; S.I.M.E.D.; Continental Casualty, Co.<br><br>Recurridos | CC-2011-315<br>CC-2011-327 | |

SENTENCIA

En San Juan, Puerto Rico, a 9 de octubre de 2012.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, restituimos las compensaciones por daños que otorgó el Tribunal de Primera Instancia. Es decir, $500,000 para Jesús Manuel; $225,000 para la Sra. Rodríguez Olavarría, el Sr. Rodríguez Ramos y el Sr. Rodríguez Rodríguez, cada uno; y $50,000 a Marisol Rodríguez Rodríguez.

Al mismo tiempo, devolvemos el caso al Tribunal de Primera Instancia para que detalle la porción de responsabilidad en que incurrió cada uno de los demandados, aunque hayan transigido su responsabilidad, y lo desglose así en la sentencia. La porción de responsabilidad de los demandados relevados de responsabilidad interna y externa, si alguna, debe restarse proporcionalmente de la partida de compensación de daños adjudicada.

Lo acordó y ordena el Tribunal, y lo certifica la secretaria del Tribunal Supremo. La Jueza Asociada señora Rodríguez Rodríguez emitió una opinión concurrente y disidente.


Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |
|---|---|
| Alejandro Confesor Rodríguez Ramos; Hilda Rodríguez Olavarría; Marisol, Alejandro Confesor y María del Carmen Rodríguez Rodríguez<br><br>Peticionarios<br><br>v.<br><br>Hospital Dr. Susoni, Inc., Administración de Servicios Médicos de P.R. (A.S.E.M.); Hospital Dr. Alejandro Otero López, Inc., Dr. Emilio Ramos Escoda (Apelante) y la Sociedad Legal de Bienes Gananciales compuesta entre éste y su esposa desconocida; Dr. Oscar Hernández y la Sociedad Legal de Bienes Gananciales compuesta entre éste y su esposa desconocida; Dr. Samuel A. Amill y la Sociedad Legal de Bienes Gananciales compuesta entre éste y su esposa desconocida; Dra. Sheila González y la Sociedad Legal de Bienes Gananciales compuesta entre ésta y su esposo desconocido; Dr. Luis Rodríguez Rodríguez y la Sociedad Legal de Bienes Gananciales compuesta entre éste y su esposa desconocida; Dr. Fulano Figueroa y la Sociedad Legal de Bienes Gananciales compuesta entre éste y su esposa desconocida; Seguros Triple S, Inc.; S.I.M.E.D.; Continental Casualty, Co.<br><br>Recurridos | CC-2011-0315<br>CC-2011-0327 |

Opinión concurrente y disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 9 de octubre de 2012

Concurro con la Opinión que emite hoy este Tribunal por entender que es acertada la devolución del caso al Tribunal de Primera Instancia para que detalle los porcentajes de responsabilidad de los codemandados, incluyendo aquéllos que hayan transigido el pleito con los demandantes. No obstante, disiento porque al confirmar al foro sentenciador en la estimación de los daños, se abandona el procedimiento establecido por esta Curia apenas hace dos años en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, 179 D.P.R. 774 (2010). Con esta última actuación, el Tribunal descarta el precedente establecido en aquel caso sin justificación plausible para ello, violentando así los principios básicos sobre el precedente judicial que hemos proferido anteriormente.

I

Los hechos que circunscriben la presente controversia están debidamente detallados en la Opinión mayoritaria, por lo que entendemos innecesario caer en la redundancia de la repetición. Es doctrina claramente establecida por este Foro que un tribunal apelativo no intervendrá con las determinaciones de hechos ni con la adjudicación de credibilidad que hizo el juzgador de los hechos, salvo que haya mediado pasión, prejuicio, parcialidad o error manifiesto. *Rolón v. Charlie Car Rental, Inc.*, 148 D.P.R. 420, 433 (1999). En el caso de daños y perjuicios por impericia médica ante nosotros, tras analizar detenidamente el expediente no vemos razón para inclinarnos por la excepción a la norma general anterior; los hechos recogidos

en la Sentencia del Tribunal de Primera Instancia y adoptados por la Opinión mayoritaria merecen nuestra deferencia.

En síntesis, lo que merece nuestra atención en términos jurídicos es, primero, si el foro de instancia debe constatar en su sentencia los porcientos de responsabilidad de cada codemandado, aun si alguno ya transigió el pleito con la parte demandante; y, segundo, cómo debe computarse un daño cuando se usa como base el valor otorgado en un caso previo. Sobre este segundo asunto, la Opinión del Tribunal propone que abandonemos nuestro previo pronunciamiento en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns* sobre la utilización de una fórmula compuesta por el índice de inflación de la moneda más el crecimiento económico, y que adoptemos ahora sólo la utilización del índice del valor adquisitivo del dólar.

## II

En cuanto al primer asunto a considerar, estimamos correcta la decisión de devolver el caso para que el Tribunal de Primera Instancia determine la participación porcentual de los codemandados liberados, si alguna. Como veremos, dicha norma ya se desprendía de la jurisprudencia dictada por este Foro.

Sobre los contratos de transacción en un pleito por daños y perjuicios, hemos sido enfáticos en que "[e]l relevo o descargo de responsabilidad hecho por un demandante a favor de un codemandado y codeudor solidario, no releva de

responsabilidad a los demás causantes comunes del daño, cuando la intención de las partes en el acuerdo de desistimiento así lo reconoce". *Szendrey v. Hospicare, Inc.*, 158 D.P.R. 648, 655 (2003); *véase además Merle v. West Bend Co.*, 97 D.P.R. 403 (1969).

Para auscultar qué efectos tendrá el acuerdo transaccional, será necesario establecer primero qué fue lo que se pactó. *US Fire Insurance v. A.E.E.*, 174 D.P.R. 846, 855 (2008). Tras examinar el alcance de la transacción, "el tribunal tendrá que determinar en su sentencia el monto líquido total de los daños ocasionados a la parte demandante por *todos* sus cocausantes y deducirá de dicho monto total aquella porción monetaria equivalente al grado de responsabilidad de[l] [codemandado relevado]". *Szendrey v. Hospicare, Inc.*, 158 D.P.R. en la pág. 658.

En el caso de autos la parte demandante llegó a un acuerdo transaccional confidencial con dos de los codemandados. Tras ello, los demandantes sometieron al tribunal dos mociones de desistimiento voluntario parcial contra esos dos codemandados, por razón de llegar al mencionado acuerdo. En dichas mociones se expresó que el alcance de las transacciones era liberar de responsabilidad al codemandado Hospital Dr. Susoni y al codemandado Administración de Servicios Médicos de Puerto Rico (A.S.E.M.) de las relación externa e interna entre los demás codemandados. En ninguna de la mociones de desistimiento se

hizo expresión a los efectos de aceptación de responsabilidad por parte de los dos codemandados relevados.

Ante ese cuadro, y siguiendo nuestras expresiones en *Szendrey v. Hospicare*, procedía que el Tribunal de Primera Instancia emitiera una sentencia en donde adjudicara el porciento de responsabilidad de cada codemandado, incluyendo a los liberados por motivo de la transacción. De estimar que éstos no fueron responsables en la causa del daño, así debió hacerse constar. Por el contrario, de concluir que sí contribuyeron en la producción del daño, debió reducirse sus porcientos de responsabilidad del monto total al que son acreedores los demandantes.

## III

Examinemos ahora lo atinente a la valoración de los daños. Como parte de la discusión, es necesario pronunciarnos en torno a las implicaciones que tiene la Opinión mayoritaria sobre nuestras decisiones pasadas, a la luz de la doctrina del precedente judicial.

## A

La estabilidad, la certeza, la eficacia y la reducción de arbitrariedad en la toma de decisiones judiciales son valores axiomáticos del Derecho y de un sistema de justicia objetivo y confiable. *Véase Vázquez Vélez v. Caro Moreno*, 175 D.P.R. 986, 987 (2009) (Rodríguez Rodríguez, J., Voto particular disidente). Por ello es que teóricos sobre el tema siempre han reconocido que "[c]ertainty and predictability are, in addition to flexibility, the basic

goals of all legal systems". A. P. Sereni, "The Code (Napoleon) and Case Law", *en Introduction to Jurisprudence* 397 (Dennis Lloyd ed., 1965).

La valorización del precedente judicial responde a consideraciones sobre la estabilidad y la certidumbre que debe tener el Derecho, en ánimo de impartir una justicia equitativa. *Véase, e.g.,* Karl N. Llewellyn, "Case Law", *en Encyclopædia of the Social Sciences* 249, Vol. III-IV (1930) ("The force of precedent in the law is heightened by ... that curious, almost universal sense of justice which urges that all men are properly to be treated alike in like circumstances"). El razonamiento detrás del precedente judicial estriba en que resulta ventajoso utilizar experiencias acumuladas de casos previos, además que evita tener que atender un mismo problema de forma diferente cada vez que se presenta ante un tribunal. *Véase* M.D.A. Freeman, Lloyd's *Introduction to Jurisprudence* 1536 (8va ed. 2008).

Ahora bien, la aplicación de la doctrina del precedente judicial no debe ser automática, sino ponderada. Por tal motivo se ha reconocido que uno de los principales peligros de ésta es que podría conducir a procesos estereotipados, insensatos y absurdos. *Id.* Por ello se habla de que la certeza judicial de las decisiones, que es uno de los valores detrás de la doctrina en cuestión, no puede ser absoluta. Karl N. Llewellyn, *The Common Law Tradition: Deciding Appeals* 17 (1960) ("I see no absolute certainty of outcome in any aspect of legal life, and think that no man

should ever have imagined that any such thing could be, or could be worth serious consideration").

Conscientes de mantener una norma que valore la certeza judicial, pero sin que llegue a fosilizar el desarrollo del Derecho, esta Curia se ha expresado a los efectos de que una decisión "no debe ser variada **a menos que sea tan manifiestamente errónea que no pueda sostenerse sin violentar la razón y la justicia**". *Capestany v. Capestany*, 66 D.P.R. 764, 767 (1946) (énfasis suplido). Conforme a ese estándar que hemos pautado en nuestra jurisprudencia, cuando se va a revisar un precedente es necesario la convergencia de varias circunstancias:

> Primero, que la norma adoptada se revele inconsistente y antagónica con otras normas establecidas posteriormente. Segundo, que la norma establecida resulte inoperante por la carencia de estándares objetivos y manejables para su aplicación. Tercero, que las condiciones que hicieron posible el primer dictamen cesen o pierdan eficacia. Y, por último, procede la revisión de un precedente cuando el razonamiento jurídico sobre el cual se asentó la norma establecida ya no responde a los valores de una sociedad moderna, diversa y plural.

*Vázquez Vélez v. Caro Moreno*, 175 D.P.R. en las págs. 988-989 (Rodríguez Rodríguez, J., Voto particular disidente).[14]

Con este marco normativo, evaluemos la controversia de autos para demostrar que con el proceder de una mayoría de

---

[14] Véase también *González v. Merck*, 166 D.P.R. 659, 688 (2006) (Hernández Denton, J., Op. Conformidad), donde se comentó que al evaluar si es justificable o no aplicar la doctrina del precedente judicial se deben tomar en cuenta tres criterios: "(1) [si] la decisión anterior era claramente errónea; (2) [si] los efectos de la decisión sobre el resto del ordenamiento son adversos, y (3) [si] la cantidad de personas que confían en la decisión es limitada".

este Tribunal se atenta injustificadamente contra la certeza y la certidumbre de nuestras decisiones previas.

**B**

En innumerables ocasiones hemos establecido que la tarea judicial de estimar y valorar los daños resulta difícil y angustiosa, debido a que no existe un sistema de computación que permita llegar a un resultado exacto en relación con el cual todas las partes queden satisfechas y complacidas. *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, 179 D.P.R. 774, 784 (2010). Por ello, como norma general, los tribunales apelativos descansan en la discreción y razonabilidad de los jueces de instancia, quienes tienen un vínculo más cercano con la prueba testifical del caso y todos los componentes que lo rodean.

En vista de ello, es norma reiterada que los foros apelativos no deben intervenir con la apreciación de la prueba y la determinación de daños que realice un tribunal de instancia, salvo que ésta sea exageradamente alta o ridículamente baja. *Sagardía De Jesús v. Hosp. Aux. Mutuo*, 177 D.P.R. 484, 509-510 (2009); *Albino v. Ángel Martínez, Inc.*, 171 D.P.R. 457, 487 (2007).[15] Esta excepción es el

---

[15] "Conceder cuantías insuficientes o ridículamente bajas por concepto de daños sufridos a causa de actuaciones antijurídicas tiene el efecto práctico de aminorar la responsabilidad civil a la que deben estar sujetas dichas actuaciones. Por el contrario, una valoración exagerada daría lugar al elemento punitivo, ajeno a nuestro sistema de responsabilidad civil". Antonio J. Amadeo-Murga, *El valor de los daños en la responsabilidad civil* 19 (2da ed. 2012)(citas omitidas).

estándar que ha regido en nuestra jurisdicción al momento de evaluar las cuantías concedidas por un foro sentenciador.

Hace dos años, en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, nos dimos a la tarea de adoptar una metodología que permitiera dar una base más concreta a ese estándar. Como parte de esa metodología, reafirmamos nuestros pronunciamientos en cuanto a la utilidad de examinar las cuantías concedidas en casos anteriores, puesto que "constituyen un punto de partida". *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, 179 D.P.R. en la pág. 785; *véase además* Richard B. Capalli, *Tort Damages in Puerto Rico*, 46 Rev. Jur. U.P.R. 241, 295-300 (1977). Además de constituir un punto de partida, acudir a decisiones anteriores reduce el margen de arbitrariedad implícito en la valoración de un daño no pecuniario. Así lo reconocen José Julián Álvarez González y Luis Pellot Juliá al sostener: "Aunque es de rigor reconocer que atribuir un valor económico a aquello que no es objeto de transacciones de mercado es inicialmente arbitrario, hacer las atribuciones posteriores sin sujeción alguna a las ejecutorias pasadas es doble arbitrariedad y expone a nuestro poder judicial a críticas basadas en suspicacia". José J. Álvarez González & Luis M. Pellot Juliá, *Responsabilidad Civil Extracontractual*, 81 Rev. Jur. U.P.R. 661, 676 (2012).[16]

---

[16] Indudablemente el punto de estos autores es que ante una arbitrariedad histórica al momento de fijar por primera vez en un caso una cuantía que indemnice un daño, será preferible acudir a ese caso originario con tal de evitar una doble arbitrariedad histórica en el tiempo presente.

Tras identificar casos anteriores similares y las cuantías concedidas en ellos, en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns* expusimos que procedía ajustar estas cuantías al valor presente, tomando en consideración el poder adquisitivo del dólar al momento en que se dictase la sentencia y, además, ajustar esa cantidad por motivo del crecimiento económico que pudo haber ocurrido entre la fecha del caso anterior y el presente. *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, 179 D.P.R. en la pág. 786. En otras palabras, adoptamos una metodología dual compuesta por el índice de inflación de la moneda y el índice de crecimiento económico. Como base para la metodología adoptada utilizamos la obra del licenciado Antonio J. Amadeo-Murga, *El valor de los daños en la responsabilidad civil* (1997).[17] En su más reciente versión del libro, del año 2012, Amadeo-Murga expresa lo siguiente sobre nuestro proceder en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*:

> La adopción definitiva de esta metodología [de ajustar las cuantías previas al valor presente] ha sido expuesta tan recientemente como el 25 de agosto de 2010 en [*Herrera, Rivera v. S.L.G. Ramírez-Vicéns*] en una clara y detallada

---

[17] El valor incalculable del libro de Amadeo-Murga se ha reconocido desde hace años por su utilidad en la cuantificación de los daños y por las "**valiosas tablas que permiten hacer la operación de traducir a valor presente una partida de daños concedida en el pasado**". José J. Álvarez González, *Responsabilidad Civil Extracontractual*, 78 Rev. Jur. U.P.R. 457, 463 (2009). Resulta inconsistente que la Opinión mayoritaria ampare su nueva postura en críticos que anteriormente han reconocido ese valor incalculable del libro de Amadeo-Murga en el ejercicio de actualizar al valor presente una partida de daños, para luego, al amparo de esos mismo críticos, descartar la fórmula propuesta y adoptada por esta Curia. Tal ambivalencia injustificada de una mayoría de esta Curia es inaceptable.

> opinión de nuestro Tribunal Supremo ... en la que considera que los factores para juzgar si las cuantías se ajustan a la norma de exageradamente alta y ridículamente baja son además de la evaluación de los daños concretos en casos específicos las cuantías concedidas anteriormente en casos similares que son útiles como parámetros para juzgar la razonabilidad de la adjudicación bajo examen. Establece también que esta metodología exige hacer un ajuste racional para considerar el valor de la moneda y finalmente de ser necesario considerar los cambios tecnológicos y económicos producto de una economía más avanzada y de mayor nivel de vida. Con esta opinión se establecen pautas razonablemente claras que ayudan al juzgador de los daños a fijar éstos a base de criterios analíticos comparativos o factores necesarios para fijarlos de una manera justa.

Antonio J. Amadeo-Murga, *El valor de los daños en la responsabilidad civil* 28 (2da ed. 2012).

Como ya dispusimos, el método adoptado en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns* tiene dos componentes: (1) considerar el poder adquisitivo del dólar al momento en que se emitió la sentencia del caso previo y compararlo con su valor a la fecha del caso presente, y (2) realizar un ajuste adicional por el crecimiento de la economía entre la fecha del caso modelo y la del caso presente. Evaluemos ambos componentes, comenzando por el segundo. Además, deseamos detenernos en la crítica que hace la Opinión mayoritaria al segundo componente de la fórmula anterior, puesto que con ella se abandona el precedente judicial de *Herrera, Rivera v. S.L.G. Ramírez-Vicéns* al proponer que se descarte ese segundo paso.

La Opinión que suscribe una mayoría de este Tribunal sostiene que es innecesario el segundo componente de la fórmula (el ajuste por crecimiento económico) porque el

Índice de Precios al Consumidor está actualizado con un año base (2006) más reciente y cercano al caso bajo estudio. Igual sugiere que se haga una revisión cada diez años, aunque es constatable que entre los años base 1984 y 2006 hubo un intervalo de veintidós años. Por tanto, la garantía de actualización decenal no nos consta. Partiendo de esto, la Opinión mayoritaria no se cuestiona cuál sería el escenario cuando entre el caso presente y el año base 2006 haya un intervalo de diez, quince o veinte años. Bajo la premisa que propone la Opinión mayoritaria, de ocurrir ese escenario, la víctima tendría que conformarse a una partida de daños utilizando un año base lejano y, en adición, sin considerar los avances tecnológicos y económicos de una nueva economía. No podemos avalar este tipo de compensación que no se ajusta a la uniformidad, al fluir de la economía ni al sentido de justicia.

Además del argumento anterior, a la Opinión mayoritaria parece incomodarle el segundo cómputo por razones muy discutibles. Para ello descansa en citar el reciente artículo de revista jurídica de José Julián Álvarez González y Luis Pellot Juliá, *supra*, para adoptar las críticas de éstos en torno a ese segundo componente de la fórmula. La Opinión cita de éstos que ajustar la compensación a base del crecimiento económico sólo tendría justificación si se concluyera que "la intensidad del sufrimiento moral aumenta según la sociedad progresa". José J. Álvarez González & Luis M. Pellot Juliá, *supra*, pág. 677.

Ante estas críticas, el licenciado Amadeo-Murga sostiene en la nueva edición de su obra:

> La posición del Profesor Ronald Martínez Cuevas, de la cual se hace eco el Profesor José Julián Álvarez refleja una concepción errónea de lo que es el daño moral compensable. El daño moral compensable del caso de [*Herrera, Rivera v. S.L.G. Ramírez-Vicéns*] no se limita a las angustias físicas que éste puede haber sufrido como resultado de ser privado de un brazo. Ya hace tiempo nuestro Tribunal Supremo endosó el concepto de incapacidad como una partida del daño moral que es fundamentalmente la pérdida del goce de las actividades y placeres de la vida que en una sociedad donde hay mejor nivel de vida se han hecho mayores.... Cuando una persona pierde por su incapacidad física la oportunidad de disfrutar, se ve privado de realizar una serie de actividades que enriquecían su vida. La compensación por daño moral incluyendo la capacidad en el disfrute de esas actividades sociales, culturales, sexuales y espirituales son mucho más amplias en una sociedad de mayores bienes económicos, tecnológicos y culturales, que en una sociedad primitiva, agrícola o limitada. Por tanto, se debe traducir en una compensación económica que le dé valor a la privación de las actividades perdidas.... En una sociedad más afluente donde las oportunidades educativas, recreativas, sociales y culturales han aumentado, la pérdida de estas actividades crea un daño mayor....
>
> .... No hay controversia en que [las adjudicaciones de daños] deben ser ajustadas por inflación pero se ha reconocido que también es necesario ajustarlas al estado del desarrollo económico y tecnológico de la sociedad en que se vive. Por tal razón las compensaciones por daño moral varían tanto en las sociedades que tienen diferentes niveles de riqueza como en la misma sociedad en diferentes épocas de acuerdo a su desarrollo económico real.

Amadeo-Murga, *supra*, págs. 81-82 (ed. 2012).

Coincidimos y compartimos plenamente la posición expresada por el licenciado Amadeo-Murga.

Siguiendo la línea de esa crítica de José Julián Álvarez González y Luis Pellot Juliá, la Opinión mayoritaria

acoge la tesis de éstos y propone eliminar el segundo componente de la fórmula, para sólo usar el primero. Ahora bien, si aun así se considera deficiente la cuantía de daños a base de usar sólo el ajuste por inflación, la propuesta de los críticos mencionados y adoptada por el Tribunal es que se eleve en el caso presente esa cuantía para que se ajuste a las circunstancias del caso. José J. Álvarez González & Luis M. Pellot Juliá, *supra*, págs. 678-679. El problema que plantea esa propuesta es que se retorna a la doble arbitrariedad histórica de la que hablamos anteriormente y sobre la que se ha criticado con vehemencia. *Véase*, *supra*, nota 3; José J. Álvarez González & Luis M. Pellot Juliá, *supra*, pág. 676. Definitivamente, esa arbitrariedad, ambivalencia e incongruencia no la podemos avalar.

Ese proceder, de cometer una segunda arbitrariedad histórica, lo vemos palpablemente en la Opinión mayoritaria. Se refleja con los tres casos resueltos previamente por este Tribunal y que la mayoría utiliza para valorar los daños de Jesús M. Rodríguez aplicando únicamente el ajuste por inflación.

Según la Opinión mayoritaria, en *Colón v. Mun. de Guayama*, 114 D.P.R. 193 (1983), los daños originales de la víctima fueron estimados en $25,000, que al aplicar la metodología propuesta por la mayoría tendrían un valor presente de **$43,279.** En *Toro Aponte v. E.L.A.*, 142 D.P.R. 464 (1997), de unos daños estimados en $150,000, su valor presente sería de **$198,387.** Y en *Morales v. Hosp. Matilde*

*Brenes*, 102 D.P.R. 188 (1974), de $39,000 otorgados originalmente, su valor actual sería de **$109,032**.

A pesar de que los valores actuales de esos tres casos modelos que propone la Opinión oscilan entre **$43,279 a $198,387**, la mayoría avala sin un ápice de discusión convincente la concesión de **$500,000** para Jesús M. Rodríguez. Cómo la Opinión mayoritaria llega de esas tres cifras a $500,000, no nos constan fundamentos plausibles. Lo más convincente es que la Opinión del Tribunal erró al cometer sus propias críticas: no darle certeza al estándar de "exageradamente alto o ridículamente bajo" e incurrir en la arbitrariedad de la valoración de un daño. Nuevamente, no podemos avalar estas conclusiones injustificadas, cuando en nuestra jurisprudencia más reciente (*Herrera, Rivera v. S.L.G. Ramírez-Vicéns*) establecimos una pauta jurídicamente sensata que atendiera ese problema de estimación de daños.

Atendido lo relativo al segundo componente de la fórmula adoptada en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, pasemos a evaluar el primero de éstos a la luz de nuevas propuestas que modifican esa fórmula.

El licenciado Amadeo-Murga reconoce que se pueden utilizar varias maneras para computar el relativo valor de la moneda. *Id.* pág. 70. En la primera edición de su libro se utilizó el Índice de Precios al Consumidor (IPC), del cual se deriva el poder adquisitivo del dólar.[18] El IPC se

---

[18] No olvidemos que además de calcular el poder adquisitivo del dólar al momento presente, la fórmula propuesta por Amadeo-Murga en la primera edición de su libro para ajustar

define como "un indicador estadístico que mide, entre dos períodos específicos, el cambio relativo promedio ocurrido en los precios al por menor de las mercaderías y servicios que consumen todas las familias en Puerto Rico". Negociado de Estadísticas del Trabajo, Departamento del Trabajo y Recursos Humanos de Puerto Rico, *Índice oficial de precios al consumidor en Puerto Rico, Revisión 2010*, 9 (17 de agosto de 2012), *disponible en* http://www.estadisticas.gobierno.pr/iepr/Estadisticas/Inventt ariodeEstadisticas/tabid/186/ctl/view_detail/mid/775/report_ id/50c09c2a-f20e-4a5f-8438-665b88b4168d/Default.aspx.[19] El poder adquisitivo del dólar, por otro lado, "se determina tomando como base el costo en dinero de las cosas esenciales para la vida, tales como los alquileres, vestidos, alimentos y combustibles durante un período de tiempo determinado, para compararlo con el costo en dinero de esas mismas necesidades durante un período anterior de igual duración". *Rojas v. Maldonado*, 68 D.P.R. 818, 830 (1948).

El IPC que se usó en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns* como parte de la metodología propuesta por Amadeo-Murga utilizaba el año base de 1984. Tras una revisión de la canasta de bienes, se fijó el año 2006 como el nuevo año

---

una cuantía concedida en un caso anterior debe incluir un ajuste por cambios tecnológicos y crecimiento económico producto de una economía más avanzada.

[19] Amadeo-Murga define el IPC más sencillamente así: "El índice de precios al consumidor está basado en los precios al consumidor de una canasta de bienes y servicios que consumen los ciudadanos del país y a base del promedio total de los bienes y servicios incluidos en esa canasta se

base del IPC. Sin embargo, al detectarse defectos en algunas categorías de productos debido a problemas de sobrestimación en los cambios en precios, dejó de publicarse el IPC. *Véase* Consultec, *Nuevo índice de precios al consumidor*, Progreso Económico 3 (octubre 2010).[20] Tras una evaluación del método empleado para calcular el IPC, se hicieron "cambios metodológicos sustanciales que reflejan grandes diferencias entre los estimados previos y los actuales". *Id.; véase además* Amadeo-Murga, *supra*, pág. 71 (ed. 2012) ("El índice fue corregido porque se consideró que el nuevo índice de 2006 sobrestimaba la inflación considerablemente"). Posteriormente, se publicó un nuevo índice en septiembre de 2010 para subsanar los errores del anterior. *Id.*

Tras estos cambios, el licenciado Amadeo-Murga modificó la metodología adoptada en la primera versión de su libro, la misma que se utilizó en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*. A tales efectos, señala:

> Debido a la **incertidumbre** que nos crea el índice corregido, hemos consultado sobre la conveniencia de utilizar otro índice. Luego de consultas hemos decidido utilizar el índice que representa el producto bruto per cápita por varias razones. No existe controversia en cuanto a su certeza, es publicado por la Junta de

---

determina el valor adquisitivo del dólar en ese momento". Amadeo-Murga, *supra*, pág. 70 (ed. 2012).

[20] Disponible en: http://www.popular.com/cs/Satellite?blobcol=urldata&blobheader=application%2Fpdf&blobheadername1=Cache-Control&blobheadername2=Expires&blobheadervalue1=max-age%3D3600&blobheadervalue2=Tue%2C+01+Jan+2013+04%3A00%3A00+GMT&blobkey=id&blobtable=MungoBlobs&blobwhere=1234299534541&ssbinary=true#GA=Progreso_Econ_mico.

> Planificación consistentemente y en este índice se recoge tanto el aumento por inflación como el aumento por el nivel de vida en uno solo, lo que hace más sencilla la operación del ajuste de compensaciones. El índice representa el conjunto de bienes y servicios producidos por los ciudadanos de Puerto Rico dividido entre el número de habitantes a precios corrientes.

*Id.* pág. 72 (énfasis suplido).

En otras palabras, "[a]l ajustar las compensaciones utilizando como índice único el producto bruto per cápita de Puerto Rico, **estamos incluyendo tanto el aumento por inflación como el aumento por nivel de vida entre el periodo comprendido entre el precedente y el año en que se va a fijar la compensación ante la consideración del tribunal**". *Id.* pág. 33 (énfasis suplido). En resumen, la fórmula binaria incorporada a nuestro ordenamiento mediante *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, ahora sólo se modifica para simplificar el procedimiento.

Al adoptar esta nueva modificación propuesta por el licenciado Amadeo-Murga, sostenemos la filosofía detrás de nuestros pronunciamientos en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*: proveer una compensación **más justa y uniforme** al adoptar una fórmula que incluya tanto la inflación de la moneda (a base del índice de precios al consumidor) como el crecimiento en el estándar de vida (crecimiento económico).[21] Con este proceder se protege la

---

[21] Contrario a lo mencionado por la Opinión mayoritaria, en la presente Opinión no descartamos el precedente de este Foro en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*. Todo lo contrario, continuamos con la propuesta de aquel caso, pero mediante una fórmula **más sencilla**. Obsérvese que la modificación propuesta por el licenciado Amadeo-Murga, y que

certeza judicial que debe caracterizar a nuestras decisiones, **en ausencia de error manifiesto que violente la razón y la justicia**. *Capestany v. Capestany*, 66 D.P.R. 764, 767 (1946).

No podemos avalar la postura de la Opinión mayoritaria porque por un disgusto con la fórmula adoptada apenas hace dos años se pone en tela de juicio la certidumbre de nuestras decisiones. Esto no debería tener cabida en nuestro ordenamiento jurídico, principalmente cuando la fórmula ahora adoptada por la mayoría de este Tribunal es sólo una más de las distintas maneras en que los economistas calculan el relativo valor de la moneda, con el escollo de que esa fórmula, ahora acogida, no se ajusta a los valores jurídicos detrás de la estimación de un daño. Por el contrario, la fórmula de utilizar el Índice de Producto Bruto per Cápita de Puerto Rico, que incluye en sí los aumentos de precios al consumidor más el aumento real en el incremento en el nivel de vida, se ajusta con mayor precisión a la filosofía del proceso de estimación de daños conforme a *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*.

---

adoptamos aquí, comprende utilizar el Índice del Producto Bruto Per Cápita de Puerto Rico, que es otra "estadística oficial que reúnen los economistas". Éste, comenta dicho autor, incluye los dos componentes de la metodología adoptada en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*: (1) el índice de precios al consumidor (IPC), de donde se deriva el poder adquisitivo del dólar, y (2) el crecimiento económico. *Id.* pág. 33. Si no avalamos la propuesta de la mayoría en la presente controversia, es precisamente porque se aleja injustificadamente de lo adoptado por esta Curia al abandonar el componente del crecimiento económico y utilizar sólo el índice de inflación de la moneda.

Nos sorprende de sobremanera la aceptación expresa de la Opinión mayoritaria a los efectos de que "[e]s obvio que **no hay consenso entre los expertos del tema sobre qué método utilizar para actualizar partidas concedidas en el pasado**.... En esta opinión **optamos** por apegarnos a la que utiliza el índice de precios ... con las modificaciones señaladas, que también han avalado expertos y economistas". Opinión mayoritaria, acápite IV (énfasis suplido). Se acepta que hay más de un método validado por expertos y economistas, pero se "opta" por "apegarse" ahora por otro método sin sujeción a lo establecido por este Tribunal. El proceder de la mayoría de esta Curia parece transmitir el mensaje de que la deontología de los jueces de este Tribunal es tan sofisticada como cualquier acción cotidiana en donde "optamos" y nos "apegamos" por aquello que el momento y el ánimo decidan.

Esa metodología adjudicativa es inaceptable. A la mayoría que suscribe la Opinión del Tribunal se le olvida "que nuestras opiniones son el resultado del estudio cuidadoso, ponderado e informado de la controversia que se nos presenta y de la norma que habremos de pautar". *Vázquez Vélez v. Caro Moreno*, 175 D.P.R. 986, 987 (2009) (Rodríguez Rodríguez, J., voto particular disidente). Nuestras decisiones, como tribunal de más alta jerarquía que pauta Derecho, no pueden sostenerse en un "optamos" por algo distinto, cuando ya hay un precedente judicial reciente validado por expertos en la materia. Para justificar ese

cambio, se debió demostrar primero el **error manifiesto** de la decisión anterior, cosa que nunca se hizo en la Opinión mayoritaria. Es impermisible que se estén revocando pronunciamientos de esta Curia por una mera insatisfacción con una norma correcta y avalada por expertos.

Ante la **ausencia de un error manifiesto que viole la razón y la justicia** en la metodología adoptada en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, ahora modificada mediante el uso del Índice de Producto Bruto per Cápita de Puerto Rico, nuestro precedente judicial debe prevalecer para ser consistentes con nuestros pasados pronunciamientos.

## IV

Evaluemos las concesiones de daños del caso de autos al amparo de la nueva fórmula: el Índice de Producto Bruto per Cápita de Puerto Rico. El Tribunal de Primera Instancia otorgó las siguientes partidas de daños morales:

a. Jesús M. Rodríguez Rodríguez (víctima): **$500,000**
b. Hilda R. Rodríguez Olavarría (madre): **$225,000**
c. Alejandro C. Rodríguez Ramos (padre): **$225,000**
d. Marisol Rodríguez Rodríguez (hermana): **$50,000**
e. Alejandro C. Rodríguez Rodríguez (hermano): **$225,000**

El Tribunal de Apelaciones las redujo a:

a. Jesús M. Rodríguez Rodríguez (víctima): **$196,024.09**
b. Hilda R. Rodríguez Olavarría (madre): **$125,956.09**
c. Alejandro C. Rodríguez Ramos (padre): **$125,956.09**
d. Marisol Rodríguez Rodríguez (hermana): **$16,349.26**
e. Alejandro C. Rodríguez Rodríguez (hermano): **$75,000**

En cuanto a **<u>Jesús M. Rodríguez Rodríguez (víctima)</u>**, coincidimos con la Opinión mayoritaria en que el Tribunal de Apelaciones, al aplicar la metodología adoptada en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns* usando como ejemplo a *Colón v. Mun. de Guayama*, 114 D.P.R. 193 (1983), erró en ajustar el valor de las partidas de daños anteriores al valor presente de la fecha en que se emitió sentencia. Su error consistió en utilizar el índice incorrecto del valor adquisitivo del dólar para el año 1983.

Usando el 2006 como año base del Índice de Precios al Consumidor y el caso modelo *Colón v. Mun. de Guayama*, la Opinión mayoritaria estimó que la partida de $25,000 en 1983, ajustada al valor presente equivaldría a $43,279. La Opinión concluyó ahí su proceso de ajustar al valor presente la cuantía de $25,000, ya que descartó el segundo componente de la fórmula adoptada por esta Curia: el ajuste por crecimiento económico.

Aparte de ese caso anterior, la Opinión del Tribunal comparó las compensaciones del caso de autos con otras dos anteriores. Tomó como ejemplo a *Toro Aponte v. E.L.A.*, 142 D.P.R. 464 (1997), donde se otorgó una compensación a la víctima de $150,000. Ese monto, ajustado al valor presente al momento de dictar sentencia, usando sólo el primer

componente de la fórmula de *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, equivaldría $198,387. El otro caso comparativo fue *Morales v. Hosp. Matilde Brenes*, 102 D.P.R. 188 (1974), donde se otorgó la suma de $39,000. Ajustado al valor presente usando sólo el elemento del poder adquisitivo del dólar, serían unos $109,032.

Según expusimos, y en ánimos de continuar el precedente de *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, adoptamos ahora la modificación de ajustar los valores previos al valor presente mediante el Índice de Producto Bruto per Cápita de Puerto Rico. Si bien este índice se publica consistentemente por la Junta de Planificación, para facilitar el proceso usaremos las tablas que provee la nueva versión del libro de Amadeo-Murga. Amadeo-Murga, *supra*, págs. 93-95 ("Tabla IV. Producto Bruto Per Cápita en Puerto Rico a Precios Corrientes, Años 1947-2010"). La tabla en cuestión provee tres columnas: (1) el año, (2) el producto bruto per cápita y (3) el porciento de aumento, usando como base el año 2010.

La metodología que ahora adoptamos es más sencilla que la anterior. El cálculo es el siguiente: se multiplica el valor del daño del caso anterior (caso modelo) por el porciento de aumento (tercera columna) del año del caso modelo. Como la tercera columna aparece en términos porcentuales, el resultado de la multiplicación anterior debe dividirse entre 100. Lo resultante es el valor presente en dólares.

Examinemos ahora los tres casos modelos que utilizó la Opinión mayoritaria. Para ello, reproduciremos una tabla como la que aparece en el libro de Amadeo-Murga, pero sólo con los años de algunos casos modelos que discutiremos.[22]

| AÑO | PRODUCTO BRUTO PER CÁPITA | % DE AUMENTO 2010 = 100 |
|---|---|---|
| 1974 | 2,364 | 673 |
| 1983 | 3,947 | 403 |
| 1997 | 8,643 | 184 |
| 2009 | 15,825 | 100.6 |
| 2010 | 15,930 | 100 |

El monto en *Colón v. Mun. de Guayama* (1983) ascendió a $25,000. Si multiplicamos dicha cantidad por el porciento de aumento para el año en que se resolvió ese caso, tenemos: 25,000 x 403% = 10075000. Eso lo dividimos entre 100 y equivale a **$100,750**.[23]

En *Toro Aponte v. E.L.A.* (1997) concedimos $150,000 en daños. Traído al valor presente según el Índice de Producto Bruto per Cápita de Puerto Rico, tendríamos: 150,000 x 184% = 27600000. Dividido entre 100, el resultado al valor presente sería **$276,000**.

En *Morales v. Hosp. Matilde Brenes* (1974) se otorgó la suma de $39,000. Ajustado al valor presente usando la fórmula anterior, equivaldría a: 39,000 x 673% = 26247000. Dividido entre 100, sería **$262,470**.

En *Sagardía De Jesús v. Hosp. Aux. Mutuo*, 177 D.P.R. 484 (2009), este Tribunal validó la otorgación de $50,000 por daños sufridos por un infante por el lapso de

---

[22] Incluimos el 2010 por ser el año base.

[23] Otra forma de hacer el cálculo es multiplicar $25,000 por 4.03.

veinticinco días. En aquel caso el foro de instancia calculó tal daño en dos mil dólares por día por veinticinco días, lo que sumaba a $50,000. Siguiendo ese frío patrón, los 144 días de angustia de Jesús M. Rodríguez a razón de $2,000 equivaldrían a **$288,000.** Si bien reconocemos que nuestras expresiones en *Sagardía De Jesús v. Hosp. Aux. Mutuo* fueron que no es prudente hacer ese tipo de cálculo a base de días, acudimos a éste sólo como un ejemplo más y no en ánimos de que se convierta en una norma o práctica de nuestros tribunales de instancia. *Sagardía De Jesús v. Hosp. Aux. Mutuo*, 177 D.P.R. en la pág. 511 n.49.

Anteriormente hemos reconocido que no existen casos exactamente iguales y que cada uno depende de sus propias circunstancias al momento de valorizar los daños. *Soc. de Gananciales v. F.W. Woolworth & Co.*, 143 D.P.R. 76, 81-82 (1997). A pesar de ello, como se mencionó, utilizar otros precedentes nos brinda una base que ayude a minimizar el campo de arbitrariedad en la otorgación de una partida de daños.

Si bien los casos modelos reseñados son muy útiles al valorizar los daños sufridos por Jesús M. Rodríguez, lo cierto es que ninguno de éstos contiene hechos exactamente iguales. Por ejemplo, en *Colón v. Mun. de Guayama* la víctima de 23 años sufrió un accidente producto del golpe de una plataforma de arrastre y diez días más tarde falleció. De la narración de hechos de ese caso se desprende que los dolores fueron intensos y angustiosos, pero es una realidad

que sólo duraron diez días. Por el contrario, los de Jesús M. Rodríguez se extendieron por casi cinco meses y "[l]a cuantía de la valoración de dichas angustias físicas y mentales depende pues, del tiempo que sobrevivió la víctima y su estado de conciencia". Amadeo-Murga, *supra*, págs. 181-183 (ed. 2012) (citando a *Colón v. Mun. de Guayama*, 114 D.P.R. 193 (1983)). Igual sucede al comparar el caso de autos con *Sagardía De Jesús v. Hosp. Aux. Mutuo*, donde los daños del infante antes de morir se prolongaron sólo por veinticinco días en comparación con los de Jesús M. Rodríguez.[24]

*Morales v. Hosp. Matilde Brenes* y *Toro Aponte v. E.L.A.* son casos en donde, a pesar de los sufrimientos y padecimientos de cada víctima debido a la impericia médica, ambas sobrevivieron, contrario a Jesús M. Rodríguez. Indudablemente ese detalle debe tomarse en consideración al momento de comparar jurisprudencia previa con el caso presente para otorgar una compensación justa.

Nos corresponde ahora evaluar los daños otorgados a Jesús M. Rodríguez vía sus herederos bajo el estándar de "exageradamente alto o ridículamente bajo", en comparación con los cuatro casos mencionados. Los ajustes al valor presente de esos casos, a los que hemos llegado siguiendo el Índice de Producto Bruto per Cápita, oscilan entre $100,750

---

[24] También hay que tomar en consideración que "cuando el término de tiempo en que se sufren las angustias mentales antes de la muerte es relativamente corto, las compensaciones [otorgadas por el Tribunal Supremo] se han

a $288,000.   Por el contrario, como se acordará el lector, utilizando la **fórmula incompleta** de la Opinión mayoritaria los ajustes fluctuaban apenas entre $43,379 a $198,387, una cifra bastante lejana de los $500,000 que se confirmó.   Esa brecha sin explicación de parte de la Opinión mayoritaria abre paso a la *doble arbitrariedad histórica* y "expone a nuestro poder judicial a críticas basadas en la suspicacia". José J. Álvarez González & Luis M. Pellot Juliá, *supra*, pág. 676.

Si bien es cierto que un principio cardinal de la práctica apelativa es otorgar deferencia al juzgador de los hechos en cuanto a la estimación de los daños, dicha deferencia no se puede sostener cuando lo otorgado sea exageradamente alto o ridículamente bajo.   Ahora bien, ante la imposibilidad de hallar una verdad transcendental en el lenguaje mismo,[25] y por ende no poder definir a ciencia cierta la frase "exageradamente alto o ridículamente bajo", nuestra jurisprudencia más reciente ha intentado fijar unos parámetros objetivos a dicha frase que limiten el campo o margen de la arbitrariedad judicial al fijar las partidas de daños.

Esos parámetros los esbozamos más recientemente en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns* y son los que debemos adoptar en la presente controversia.   Así, utilizando las partidas de daños de casos previos que

_____

limitado considerablemente".   Amadeo-Murga, *supra*, pág. 185 (ed. 2012).

analizamos, ajustadas al valor presente, no podemos confirmar la cuantía de $500,000 otorgada por el Tribunal de Primera Instancia por los daños sufridos por *Jesús M. Rodríguez*. Ésta, pues, se distancia considerablemente de las otorgadas en los casos examinados y no se justifica mediante el proceso metodológico que hemos adoptado como Tribunal.

Teniendo en cuenta que en los cuatro casos examinados las cuantías frecuentan cifras que rondan cerca de $300,000, debemos cuantificar el daño de la víctima del caso de autos a base de esas cifras. Partiendo, como ya mencionamos, que Jesús M. Rodríguez sufrió más días que las víctimas de los casos modelos y hasta falleció, estimamos que una cuantía jurídicamente y metodológicamente razonable por los daños de la víctima en este caso, es de **$350,000**.[26]

Veamos ahora las cuantías otorgadas a **Hilda R. Rodríguez Olavarría** (madre) y a **Alejandro C. Rodríguez Ramos** (padre). A éstos se les otorgó individualmente $225,000.

En cuanto a los progenitores, la Opinión mayoritaria usó de precedente el caso de *Hernández v. La Capital*, 81 D.P.R. 1031 (1960), tal cual hizo el foro apelativo

---

[25] *Véase* Jacques Derrida, *Plato's Pharmacy*, en *Dissemination* (Barbara Johnson trad., 1981).

[26] La diferencia entre las cifras de los casos modelos que rondan cerca de $300,000 y lo que concederíamos a Jesús M. Rodríguez no es exageradamente alta y se justifica con los sufrimientos particulares de la víctima en el caso de autos. Contrástese esa diferencia con aquélla propuesta por la Opinión mayoritaria, que a base de su metodología trunca va desde casi $200,000 a $500,000. Esa diferencia de $300,000 en la Opinión del Tribunal abre la brecha para mayores

intermedio. En ese caso se le otorgó a la madre de la niña fallecida por indebida supervisión del hospital, la cantidad de $15,000 por sus propios daños. Aplicando sólo el primer componente de la metodología adoptada en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, la Opinión del Tribunal ajusta esa cuantía al valor presente de **$76,129.**

Además de ese caso modelo, la Opinión citó el caso reciente de *Sagardía De Jesús v. Hosp. Aux. Mutuo*, 177 D.P.R. 484 (2009), donde se le concedió al padre de la infante fallecida **$400,000** y a la madre **$350,000.**[27] Incongruentemente con la metodología usada para otros casos, la Opinión mayoritaria incrementa esas partidas de daños a $486,022 para el padre y a $364,516 para la madre. *Véase* escolio 13 de la presente Opinión.

Evaluemos el escenario cuantitativo de estos dos casos bajo la aplicación del Índice de Producto Bruto per Cápita. Nuevamente, reproduciremos una tabla como la que aparece en

---

especulaciones sobre la arbitrariedad judicial al fijar cuantías de daños.

[27] Yerra la Opinión mayoritaria cuando utiliza este caso para calcular las partidas de daños otorgadas a los padres de Jesús M. Rodríguez y en lugar de usar el índice del valor adquisitivo del dólar para el año 2009, utiliza el del año 2004. La incongruencia de la mayoría estriba en que para los demás casos modelos se usó el índice del valor adquisitivo del dólar para el año en que este Tribunal resolvió el caso, mientras que en *Sagardía De Jesús v. Hosp. Aux. Mutuo* se usó el año en que el foro de instancia dictó sentencia (2004). Véase por ejemplo, *Hernández v. La Capital*, 81 D.P.R. 1031 (1960), donde la Opinión mayoritaria usó el índice de valor adquisitivo del dólar para el año 1960 (año en que esta Curia resolvió esa controversia), a diferencia de *Sagardía De Jesús v. Hosp. Aux. Mutuo*, resuelto en el año 2009, pero donde se usó el índice del 2004. Ésta es otra más de las incongruencias

el nuevo libro de Amadeo-Murga, pero con los años que deseamos examinar:[28]

| AÑO | PRODUCTO BRUTO PER CÁPITA | % DE AUMENTO 2010 = 100 |
|-----|--------------------------|-------------------------|
| 1960 | 716 | 2,182 |
| 1961 | 769 | 2,071 |
| 1971 | 1,908 | 836 |
| 2009 | 15,825 | 100.6 |
| 2010 | 15,930 | 100 |

Empezaremos por *Hernández v. La Capital* (1960) para ajustar el monto de $15,000 al valor actual. Siguiendo la misma fórmula que detallamos anteriormente, el resultado es el siguiente: 15,000 x 2,182% = 32730000. Dividido entre 100, aquella cifra de 1960 asciende a **$327,000**. Compárese ésta con la escasa suma de **$76,129** que calculó la Opinión mayoritaria usando sólo el índice de inflación de la moneda. Claramente, eso no se ajusta a la realidad presente de nuestra función de indemnizar la muerte de un hijo, particularmente cuando está presente un cuadro fáctico tan revelador como el de autos. Por eso la necesidad de adoptar la nueva modificación que propone Amadeo-Murga y que acogemos en esta Opinión, pues son una continuación de la manera más justa y uniforme que esta Curia optó en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns* al valorizar los daños no pecuniarios.

---

que presenta la Opinión mayoritaria, razón por que la fiabilidad de la ponencia se ve minada.

[28] Incluimos el 2010 por ser el año base.

En cuanto a *Sagardía De Jesús v. Hosp. Aux. Mutuo* utilizaremos las mismas cifras otorgadas, puesto que se dictó el mismo año que la sentencia del caso de autos.

Para ampliar el espectro de casos precedentes que sirvan de modelo, utilizaremos a *Ortiz Martínez v. Great American Indemnity*, 83 D.P.R. 306 (1961), en donde un joven de diecisiete años falleció producto de un accidente en la carretera. A la madre le otorgaron $20,000, que ajustados al valor presente siguiendo el Índice de Producto Bruto per Cápita, se traducen en **$414,200**. Al padre le asignaron $2,000, que se ajustan a **$41,420**. Por último, en *Sánchez v. Liberty Mutual*, 100 D.P.R. 1 (1971), también falleció una joven por accidente en la vía pública. En tal ocasión se le otorgó a la madre $25,000 y al padre $10,000. Ambas cifras se traducen en **$209,000** y **$83,600**, respectivamente, siguiendo la misma fórmula anterior.

Entre estos cuatro casos, que ciertamente se diferencian del presente, las cuantías ajustadas varían entre **$41,420** a **$414,000**. De éstos, en tres casos se otorgaron cuantías que ajustadas al valor presente sobrepasan los $325,000. Si bien el principio rector es que los tribunales apelativos no intervendremos con la discreción, apreciación y determinación de los daños de los tribunales de instancia, *Velázquez Ortiz v. U.P.R.*, 128 D.P.R. 234, 236 (1991), al aplicar la metodología comparativa reseñada, estimamos que las partidas de $225,000 otorgadas a cada progenitor se apartan considerablemente de

la mayoría de los casos examinados (se alejan por sobre cien mil dólares). Resultan, pues, injustificadamente bajas y habría que aumentarlas. *Id.* A base de los casos previos, de la evidencia examinada en el expediente del caso, del principio de mantener la uniformidad en estos casos y del propósito de reducir el margen de arbitrariedad en las valorizaciones de daños, estimamos que las compensaciones de los progenitores debieron ser de **$325,000** a cada uno.

Por último, veamos lo otorgado a los hermanos **<u>Marisol Rodríguez Rodríguez</u>** y **<u>Alejandro C. Rodríguez Rodríguez</u>**. El foro de instancia concedió a la hermana $50,000 y al hermano $225,000, lo que representa un aumento de 450% respecto de lo concedido a la hermana. En otras palabras, tras partir de la premisa de que los hermanos se encuentran en una misma posición con relación a Jesús M. Rodríguez, distinta a la de sus padres, el Tribunal de Primera Instancia concluyó que a base de la evidencia sometida el sufrimiento del hermano merecía un aumento de 450% en comparación con el sufrimiento de la hermana. Aparentemente, el Tribunal de Apelaciones llegó a una conclusión similar, puesto que le otorgó al hermano $75,000, mientras que a la hermana $16,349.26. La cuantía otorgada al hermano por el foro apelativo también significa aproximadamente un incremento de 450% de lo concedido a la hermana.

La Opinión mayoritaria utilizó de caso modelo, al igual que el Tribunal de Apelaciones, el caso de *Ortiz Martínez v. Great American Indemnity*, 83 D.P.R. 306 (1961), donde se le

concedió a cada hermano la suma de $2,000. Tras aplicar sólo el índice de inflación, la Opinión estimó esa cuantía en **$9,914** al valor presente de la sentencia. Además, la Opinión del Tribunal descansó en *Velázquez Ortiz v. U.P.R.*, 128 D.P.R. 234 (1991), en donde se aumentó lo concedido por el foro de instancia a $10,000 a cada hermano. Traído al valor presente según el **método trunco** que ahora decide usar la mayoría, esa cifra equivale a **$14,731**. Cómo la Opinión mayoritaria logra justificar la equiparación de esos valores a $50,000 y $225,000, resulta una incógnita que se asemeja a los tiempos previo a adoptar una metodología más prudente, sensata, uniforme y menos arbitraria en *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*.

Siguiendo a *Herrera, Rivera v. S.L.G. Ramírez-Vicéns* y aplicando el Índice de Producto Bruto per Cápita a los dos casos anteriores, vemos que las partidas concedidas por el foro de instancia no son exageradamente altas o ridículamente bajas. Situemos nuevamente una tabla con los índices que facilita la nueva versión del libro de Amadeo-Murga:

| AÑO | PRODUCTO BRUTO PER CÁPITA | % DE AUMENTO 2010 = 100 |
|---|---|---|
| 1961 | 769 | 2,071 |
| 1991 | 6,426 | 247 |
| 2010 | 15,930 | 100 |

Si usamos como ejemplo a *Ortiz Martínez v. Great American Indemnity* (1961), la cifra de $2,000 multiplicada por 2,071% equivaldría al valor presente de **$41,420**. En cuanto a *Velázquez Ortiz v. U.P.R.*, los $10,000 otorgados en

1991 se traducirían en **$24,700.** Objetivamente, no hay una marcada diferencia entre estas cuantías y los $50,000 que el foro sentenciador otorgó a la hermana, Marisol Rodríguez Rodríguez. Ergo, debe confirmarse lo otorgado. Ahora bien, tanto el Tribunal de Primera Instancia como el Tribunal de Apelaciones entendieron que Alejandro C. Rodríguez Rodríguez había sufrido unos daños morales mayores, razón por la que ambos foros otorgaron cifras mayores que a la hermana.

Según mencionamos al comenzar a discutir las cuantías otorgadas a los hermanos, la posición de éstos con relación a Jesús M. Rodríguez es distinta que la que ocupan los progenitores. Aunque no hay una ciencia cierta que concluya que el dolor de un padre o madre es incomparable al de un hermano, la sensatez humana nos llevan a ese pensar. Por ello, a pesar de que en el expediente obra evidencia sobre el dolor intenso del hermano, no podemos concluir que la cuantía a la que es acreedor deba ser igual a la de los progenitores.

Nuevamente, debemos enfocarnos en reducir los márgenes de arbitrariedad que rodean una valorización del daño moral. Así, partimos de los casos previos. Habiendo concluido que la adjudicación de $50,000 a la hermana es justa y razonable conforme a la jurisprudencia anterior, debemos aplicar un cálculo muy particular a esta controversia. Conforme comentamos, los foros inferiores estimaron que la cuantía que representara el sufrimiento del hermano debía ser 450%

mayor que la de la hermana.[29] Si aplicamos ese mismo incremento porcentual a los $50,000 que ya validamos, tenemos que la cuantía a otorgar a Alejandro C. Rodríguez Rodríguez debe ser de $225,000. No habiendo razones para concluir que el juez de instancia erró en su apreciación y valorización de los daños de los hermanos de Jesús M. Rodríguez, procede que confirmemos ambas cuantías.

## V

Finalmente, procede que revoquemos al Tribunal de Apelaciones por errar en la valoración de los daños. Así, estaríamos modificando las partidas concedidas por el Tribunal de Primera Instancia y confirmando sus determinaciones. El resultado final según nuestra metodología sería el siguiente: Jesús M. Rodríguez Rodríguez, $350,000; Hilda R. Rodríguez Olavarría, $325,000; Alejandro C. Rodríguez Ramos, $325,000; Marisol Rodríguez Rodríguez, $50,000; y Alejandro C. Rodríguez Rodríguez, $225,000. El monto total de los daños que debieran pagar los codemandados, según nuestra metodología, asciende a **$1,275,000**; mientras que el monto total que sentenció el Tribunal de Primera Instancia, confirmado por la Opinión mayoritaria, asciende a **$1,225,000**. Tras analizar detenidamente las circunstancias que rodearon este caso, entendemos que es más justo, equitativo y uniforme, con relación a nuestros precedentes, que se aplique la

---

[29] No nos referimos aquí a que el hermano sufrió 450% más que la hermana, sino que la cuantía que representa ese sufrimiento debe contener una diferencia porcentual de 450%.

metodología de *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, que es la que adoptamos en esta Opinión disidente.

Por considerar que con la Opinión mayoritaria se atenta contra la inestabilidad y precariedad de nuestros pronunciamientos, máxime cuando no hay razón válida para cambiar nuestra norma anterior, disiento vehementemente del proceder de la mayoría de este Tribunal.


                            Anabelle Rodríguez Rodríguez
                                 Juez Asociada